Woodward *vs.* Gates *et al.*

IRWIN H. WOODWARD, plaintiff in error, *vs.* SAMUEL M. GATES *et al.*, defendants in error.

1. In an action for waste, a witness should state facts, and while he may give his opinion, accompanied by the facts upon which it is predicated, as to the number of acres from which the timber has been cut, the value of the land before and after it was cut, the whole number of acres in the tract, the proportions of timbered land and the like; it is error in the Court to permit him to give, in evidence, his opinion that the estate of the remainder-man has been damaged a certain amount by the defendant. It is the province of the jury to draw, from the facts stated, their own conclusion, as to the amount of damage, if any, sustained by the plaintiff.

2. If the complainant, in a bill in equity, intends to waive the answer of the defendant under oath, he must so state distinctly. The statement that he is *able* to prove the allegations in his bill, without the answer of the defendant, is not a compliance with the Code.

3. If complainant waives an answer under oath, the answer filed, is not evidence. It may be used, however, as an admission of record, and complainant is not bound to prove any fact admitted. But when so used, the admission must be taken, together with any qualifications or explanations accompanying it.

4. The statute of Gloucester, as to the forfeiture, was not of force in Georgia prior to the adoption of the Code, and it was error in the Court to instruct the jury that they might find a forfeiture of the life-estate upon evidence of acts, most, if not all, of which were done prior to that date. The evidence upon which the forfeiture was claimed should have been confined to acts of waste since 1st January, 1863.

5. The stringent rules of the English law, relative to waste, were not applicable to our condition; and were not embraced in our adopting

statute. It is not always waste in this State for a tenant-for-life to cut growing timber, or clear land. Regard must be had to the condition of the premises; and the proper question for the jury to decide, under the instruction of the Court, will be, did good husbandry require the felling of the trees, and were the acts such as a judicious, prudent owner of the inheritance would have committed?

Equity. Waste. Tried before Judge COLLIER. Meriwether Superior Court. August Term, 1867.

A. Gates and Catharine Gates, minor children of Samuel M. Gates, deceased, and Samuel M. Gates, James B. Gates, Mary E. Gates, Nancy C. Gates and Matilda H. Gates, minor children of Benjamin K. Gates, deceased, by their guardian and next friend, filed a bill against Irwin H. Woodward, by which they made the following averments: In 1854, their grand-father, Benjamin Gates, died, leaving a will, of which the third item was as follows:

"I give and bequeath to my beloved wife, Emeline Gates, for and during her natural life only, (here follows a description of certain lands in Meriwether county, Georgia,) containing, in all, two thousand and twenty-two and one quarter acres, more or less, with all the rights and members thereunto belonging. And also, forty-one negroes, to-wit: (naming them, etc.,) and their increase, and also all my household and kitchen furniture, the blacksmith tools at my house place, my cotton gins and all the out-houses, furniture at my home-place, salamanda safe, double barrelled shot-gun and revolvers; and at the death of my wife, all the aforesaid property to go to my grand-children Benjamin K. Gates and Samuel M. Gates, during their natural lives, and at the death of each one of them, his portion to his children, the salamanda safe to Benjamin K. Gates, and the balance equally between said Benjamin K. Gates and Samuel M. Gates."

The will was proven, and the executor at once put said Emeline into possession of said lands. Soon afterwards, the widow married said Woodward, who owned a number of slaves and was largely in debt.

At the date of the marriage, a reasonable proportion of said lands still had the original forest growth thereon, but there was cleared land sufficient to employ the slaves bequeathed to said Emeline. Said lands, if properly preserved, would be of great value to the remainder-men. But Woodward soon

determined to use said lands, without reference to the preservation of the reversionary interest, but so as to make the most of it for himself during his wife's life. Accordingly, Woodward moved his family, by a former wife, and his own slaves, on to said premises, and, from time to time, hired other slaves and employed the accumulated force of said slaves in cutting down the forest growth and clearing said land. Once complainants' neighbors and relatives remonstrated with Woodward about this waste, and Woodward promised to desist, and did so for a short time; but the complainants' fathers both having died, leaving these minor children, Woodward renewed his acts of waste, and is continuing them, and will render the reversion almost, if not entirely, worthless, unless he be restrained. Since the emancipation of slaves, he is more wanton in said acts, and avows a purpose to hire freedmen for the express purpose of clearing more of the land. The waste already done by him has damaged the reversion $10,000 00.

(They further averred that Woodward had received, as the proceeds of said waste, large sums of money, which he had invested in lands and other property elsewhere, and had taken the titles in his own name in fee, and was thus seeking to transfer the real value of the lands so held for the life of said Emeline, to other lands and other property, to which he may acquire the title in fee. And they prayed that Woodward should " set forth in his answer to this bill his annual income from said estate, and the manner of investing the same, and what property he has accumulated, its kind and character, and the titles taken since he has intermarried with said Emeline, and that he be required to convey to them any lands and other property secured to himself by reason of said waste, " And in the prayer for *subpœna,* at the close of the whole bill, they prayed that Woodward should appear and " answer the premises under his corporal oath.")

They stated that they " were able to prove, without the answer of said defendant," the other allegations. They contended that the life-estate was forfeited by said waste, and prayed that it should be so decreed, and that he should be

enjoined from future waste, and be made to pay for the past waste, etc.

The defendant demurred generally upon the grounds that the complainants had an adequate common law remedy, and shewed no reason for the relief sought, and specially to so much of the bill as sought discovery and recovery of the amount of income from the estate mentioned in said bill, and the investments made by said defendant of the same, and to so much of said bill as sought a forfeiture of the life-estate.

The Court sustained the special demurrer, and struck out those parts of the bill and of the prayer which are stated within brackets *ante.*

Woodward then answered the bill. He admitted the allegations as stated, except as follows : He married said widow in April, 1855, she then being about forty-five years old ; he then lived in Monroe county, Georgia, and was amply able to pay all his debts without inconvenience or sacrificing any portion of his estate ; he took his wife to his said house, and staid there till the next year, and then moved with her and his three children to said Meriwether place ; that he carried with him one negro man, his carriage-driver, and a woman, his cook, and their six children, and he purchased another man and his wife and three children, and also purchased two negro girls and two children: used these girls as seamstresses only ; besides those, he did not take to said place any slaves, either his own or hired, though he then owned twenty-five or thirty slaves. In 1857, he purchased about fourteen hundred acres, the Petit place, adjoining said premises, and early in 1858, removed his slaves to the Petit place. He stated that when he went to the Gates place, it had twelve or thirteen hundred acres cleared, and nine hundred acres in the forest growth ; some six or seven hundred acres of the cleared land was worn out and seemed to have been turned out some time before, unfit for cultivation, grown up in pine and other bushes, etc.; of the remainder, there was about two hundred acres of fresh land, and in good order for cultivation, the balance, though much worn, by manuring and preparing, would pay for cultivation ; but there was not sufficient land cleared to keep the

hands employed, etc. He gave a detailed statement of his management of it, and the Petit place, so as to show that he was not clearing too much of said premises, and stated that during a part of the time, while he was so clearing, complainants' fathers passed by, saw it being done, and made no objection; that since 1858, he had not cleared in all over one hundred acres on said Gates place, and had improved the swamp by ditching, etc.; the clearing in part, was removing timber prostrated by an hurricane.

On the trial, Dr. PARKS testified, that he had known the land many years, and lived next to it, that Woodward commenced clearing on the premises in 1855, and in that year and in 1856, cleared one hundred and forty or one hundred and fifty acres, and was clearing on the land in the fall of 1866; that a part of this, say almost all, or about forty or fifty acres, was land on which the timber had been torn down by an hurricane, and it was proper and good husbandry to clear this up, and use the timber in repairing the place; about one hundred acres cleared by him was swamp-land, which required great labor to clear and reduce it to cultivation. He said he thought that the land was worth, when Woodward took possession of it, $3 00 or $4 00 per acre, but now nothing; perhaps, fifty cents per acre, as there is not sufficient timber to keep it up; that, in his opinion, the reversionary estate had been damaged, by Woodward's waste, $3,000 00 or $4,000 00. He thought it would take the timber of thirty-five acres per annum to keep up the farm. A Mr. Jones testified, that Woodward had cleared about one hundred acres on said land; that the timber on fifteen or twenty acres would be needed per annum to keep the place in repair, and he stated that, in his opinion, the reversionary estate had been damaged, by Woodward's clearing, $1,000 00.

There was some other testimony, but that is not material now. The defendant's solicitor objected to the said opinions of Parks and Jones, but the Court allowed them given in as evidence.

The Court charged the jury, among other things, as follows: That portion of the bill which originally prayed for a discov-

ery having been stricken out, upon demurrer, the bill is one in which the complainants undertake to prove the facts necessary for a recovery. The answer is simply pleading, not evidence for the defendant; the admissions in the answer against his interest, is evidence for the complainants. Waste is anything which works a permanent injury to the substance of the inheritance, willfully committed or carelessly allowed. Does the testimony show that there has been a waste or reckless use or consumption of the substance of the inheritance of complainants by the defendant, and that without due regard to the rights of complainants? If so, that is waste.

He then read section 2235 of the Code to the jury, and added: If you should believe, from the evidence, that the life-tenant has failed to exercise the ordinary care of a prudent man, in the use and enjoyment of such estate, for the protection and preservation of the estate of the remainder-men, or willfully or carelessly permitted acts of waste to take place, he forfeits his interest to the remainder-men, and they are entitled to immediate possession.

The jury found that the life-estate was forfeited, and that Woodward should pay complainants $2,000 00 and costs. A new trial was moved for, upon the grounds that the verdict was contrary to the evidence, etc., and because the Court had erred in each of said propositions stated in his charge, and because he erred in allowing Parks and Jones to give their said opinions. The Court refused a new trial, and this is assigned as error, on said grounds.

W. DOUGHERTY, B. H. BIGHAM, for plaintiffs in error.

B. H. HILL for defendant in error.

BROWN, C. J.

It was competent for the witnesses to give their opinions, accompanied by the facts upon which it was predicated, as to the whole number of acres from which the timber had been cut by Woodward, the value of the land before and after it was cut, the proportion which the timbered land bore to the

Woodward *vs.* Gates *et al.*

cleared land on each tract, and the like. But it was error in the Court to permit the witnesses to give their opinions that the estate of the remainder-men had been damaged a certain amount by the acts of the life-tenant. The amount of damage, if any, was the very question to be found by the jury. It was the conclusion to be drawn from all the facts given in evidence. It was the province of the twelve jurors, after weighing all the evidence, to form that opinion, or draw that conclusion, and not the province of the witness. 10 *Ga. R.*, 529.

2. We do not think the complainant by his bill waived the answer of the defendant in this case. It is true he states he is *able* to prove the allegations of the bill without the answer of the defendant. This may be true, and he may still have a right to insist on the answer. If the bill were for discovery only, and it contained this statement, he might not have a right to maintain it. But, having alleged other equitable grounds for the interference of a Court of Chancery, and having obtained a *status* in that Court, he has a right to the answer of the defendant, unless he specially waives it. Section 3046 of the Revised Code provides, that a party seeking relief, may waive discovery; and in such case the defendant's answer is not evidence. Section 4136 declares that defendant need not verify his answer, if discovery is *specially disclaimed.* The mere statement that the complainant is *able* to prove the allegations contained in his bill, is not such special disclaimer as the Code contemplates.

3. When the answer is specially disclaimed, it is not evidence for the defendant. But like any other pleading, it is an admission of record, so far as it contains statements or allegations favorable to the complainant, who is not held to prove any fact admitted by the answer. If, however, the complainant insists on the answer as an admission of record, he must take it as a whole; and he will not be permitted to insist on the admitted fact, to the exclusion of any qualifications or explanations accompanying it.

4. We are satisfied the charge of the Court was too sweeping as to the forfeiture of the estate by Woodward. The

evidence of waste in this case, related mainly, if not entirely, to a period anterior to the adoption of the Code, (first January, 1863.) Prior to that time there was no law in this State which operated a forfeiture of the life-estate by the commission of waste. The life-tenant was liable for the damage done, but not to the forfeiture of the life-estate.

This question was decided by this Court in the case of a widow, who had a life-estate in dower, and had committed waste, in *Parker et al. vs. Chambliss,* 12 *Ga.,* 235. In that case the question was whether the widow, the waste being admitted, did not forfeit her estate under the statute of Gloucester, and the Court held that she did not. They ruled that the statute of Gloucester was of force under our adopting statute, so far as it makes a tenant-in-dower *liable* for waste committed, but they rejected the harsh and penal *remedy* provided by the statute. We concur in this view. The State of Georgia has her own system of *penal* laws, and we see no reason why an English statute may not be held to have been applicable to our condition, when our adopting statute was passed, so far as rights are concerned, and inapplicable as to the harsh penal remedies given by it.

The learned Judge delivering the opinion in the case of *Dickinson et al. vs. Jones and Thornton,* 36 *Ga.,* 97, seems to hold that the statute of Gloucester is of force in this State, without qualification. But this is *obiter,* as the only question before the Court was, whether the Court below erred in refusing to grant an injunction to stay waste, in the case made by the bill. And by reference to the report of the case, we find it distinctly stated that the complainants prayed an "injunction against the acts of waste aforesaid," *without restricting the proper use of the life-estate.* It is evident, therefore, that the question of *forfeiture* was not before the Court, and no adjudication was made on that point. Indeed, no forfeiture was claimed.

5. We are satisfied that the stringent rules of the English law relative to waste were not applicable to our condition, and were not adopted in this State. At the time our adopting statute was passed, the country was new; comparatively,

Woodward *vs.* Gates *et al.*

a very small part of our lands were in cultivation, the cleared lands were everywhere surrounded by plenty of forest, and timber was considered of but little value.  In many cases it was a positive benefit to the inheritance for the tenant-for-life to clear up, and put part of the wild land in cultivation. That which would in England have been very injurious to the estate of the remainder-man, was in Georgia very beneficial.  The one was an old country, with a very limited quantity of timber; the other was a new country, covered with boundless forests, where it was difficult to get labor to clear the land and prepare it for cultivation.  In England, the felling of the timber by the tenant-for-life worked irreparable injury.  In Georgia, it may or may not have injured the estate of the remainder-man; and if it did, the damage could generally be compensated by going a little further to the timber on the wild lands.  Under these circumstances, it was reasonable to compel the tenant-for-life to pay the damages done by him to the inheritance, but unreasonable to forfeit the life-estate with treble damages.

At the time the Code was adopted, our condition was materially changed.  A large proportion of the timbered land of the State had been cleared and cultivated, and timber was much more an object than it was at the date of our adopting statute.  The result was the adoption of a new rule, that in case of waste, the tenant-for-life shall forfeit his interest to the remainder-man, if he elects to take immediate possession. But the rule of the statute of Gloucester as to treble damages is not still adopted.  Revised Code, 2229.  This section of the Code declares that the tenant-for-life is entitled to the *full* use and enjoyment of the property, so that, in such use, he exercises the *ordinary care* of a *prudent* man for its preservation and protection, and commits no acts tending to the permanent injury of the person entitled in remainder or reversion.  In determining what amounts to waste, regard must be had to the condition of the premises, and the inquiry should be, did *good husbandry*, considered with reference to the custom of the country, require the felling of the trees, and were

the acts such as a judicious, prudent owner of the inheritance would have committed ?    2 Greenl. Ev., 656; 10 *Ga.*, 321; 7 John., 232; 4 Dev. and Bat., 179; 7 Ala., 514.

Judgment reversed.