*Cowart & Vocelle,* for plaintiff. *S. C. Townsend,* for defendants.

---

## LEE & BRADSHAW *et al. v.* ROGERS *et al.*

1. A tenant holding under a devise of land " during widowhood " has the right to use the land and pine trees growing thereon, by hacking and otherwise working the trees for turpentine purposes, as against a person entitled in reversion, where prior to his death the testator used the land and trees for such purposes.

2. It is a question of fact whether the working of trees for turpentine purposes by a tenant for life is so injurious to the trees as will be prohibited at the instance of a person entitled in reversion, where the working consists of cutting series of streaks on the bodies of the trees extending through the bark in such manner as to make one exposed surface and in some instances more than one, depending upon the size of the tree, whereby crude gum is caused to exude at such exposed surfaces and deposit in metal cups attached to the trees and from which the gum is collected and carried away.

No. 2151. September 13, 1921.

Injunction. Before Judge Thomas. Thomas superior court. May 24, 1920.

In 1894 Moses Dukes executed a will, and died in 1898. The testator left a widow and ten children. Item one of the will, gave direction as to disposition of testator's body. Item two directed all just debts to be paid. Item three provided: " I give and bequeath to my beloved wife, Sarah Jane Dukes, for and during her widowhood, all the property I own and possessed of: consisting of lands and tenements, horses, mules, cows, hogs, household and kitchen furniture, plantation tools, wagons, carts, buggies, carriages, all notes and accounts, cash and whatsoever." Item four appointed testator's wife,

Sarah Jane, sole executrix. The will was probated in 1898. At the time of his death testator was seized and possessed of a tract of land known as the Dukes place, containing about 500 acres and comprising parts of lots numbers 425 and 450 in the 13th district of Brooks County, of which about 300 acres was woodland. On the 3d day of February, 1919, Sarah Jane Dukes, the widow of the testator (who had not again married), executed a lease to Lee & Bradshaw, turpentine operators, covering all of the timber on the land. The lease stated that it was "for all the purposes of boxing, working, and otherwise using said timber for turpentine purposes. . . The above timber formerly worked by B. O. Wood. The life of this lease four (4) years from above date, for all virgin timber on above lot." The lessees entered upon the land and commenced to work all the timber thereon suitable for turpentine purposes by the cup method, which involved cutting streaks through the bark and sap of the tree so that it would exude gum; and attaching metal cups to the tree in such manner as to catch the gum. Subsequently and between the dates May 17th, 1919, and August 20, 1919, inclusive, W. J. Rogers, having notice of such lease and operation thereunder, acquired by purchase several undivided interests amounting to 6/10th interest in all of the land. He was a son of Mrs. Mary Lizzie Rogers, a daughter of the testator, and purchased directly from some of the children, and in other instances from transferees of children and heirs of deceased children of the testator. In October, 1919, W. J. Rogers and his mother, Mrs. Mary Lizzie Rogers, asserting title as tenants in remainder under the will of the testator, instituted an action against Lee & Bradshaw, to enjoin the working of the trees for turpentine purposes, on the ground that the trees were part of the realty and the working of the trees for such purposes was permanent injury to the trees and the land on which they were growing, amounting to waste, which the widow as a tenant during widowhood had no right to authorize. At the interlocutory hearing there was an issue, under the pleadings and evidence, as to whether the trees which defendants were working had been worked prior to the death of the testator and as to whether the manner in which the trees were being worked was injurious to the trees. The plaintiff's evidence was to the effect: that during the life of the testator the land had been worked for turpentine, but all trees that had been so worked were cut off for sawmill purposes

before the death of the testator, and practically all of the trees that defendants are working are young trees that have grown up since the death of the testator; that B. O. Wood had worked the land for turpentine purposes, covering a period of six years which ended in 1918, which was subsequent to the testator's death; also that the working of the trees extracted the sap to such extent as to be permanently injurious, and defaced the trees in such manner as to render them liable to burn and blow down, and consequently the use to which the trees were being put by the defendant was destructive of the estate. The defendants' evidence was to the effect: that in the main the trees which they were working were being worked by the old "box" process at the time the will was executed, and were being so worked at the death of the testator, and had been continuously worked by successive lessees up to the time of the lease to defendants; that such "box process" involved cutting boxes in the tree into which the gum would run, the "box" serving the purpose of the metal cup employed in the new or "cup process;" that the old method of extracting turpentine was to cut a number of faces and boxes on the same tree, boxes being cut in such way as to catch and hold the gum that would flow; that even under this method the percentage of the trees that were killed was very small; that where trees have been worked by this old method and do not die, the reworking or back-boxing of them by putting streaks thereon will not injure them; that the taking of the gum from the trees is not injurious to trees or to the land; that each year the tree makes for itself a new supply of gum or sap, and contains as much gum the second year as it did the first, which is true of subsequent years; that the idea of putting a streak upon the tree is simply to scarify the surface so as to cause, at the proper season, the gum to flow from this wound into the cup that has been attached to receive it; that after the gum has run for one season this streak will heal up, and it will not run again the next year unless a new streak is placed upon it for the same purpose; that defendants' method of working the trees was by this "cup process," and was not injurious to the trees or land; and that all of the income of the estate left by the testator would be insufficient to support the widow, if she were not allowed the income derived from leasing the timber. The judge hearing the case rendered a decision at chambers as follows: "After consideration of the law and

the evidence in this case, it is ordered and decreed that the defendants be restrained and enjoined from cutting, boxing, or putting streaks upon the timber described in plaintiffs' petition, until the hearing. In so ordering the chancellor is not so doing in the exercise of the legal discretion vested in him, but upon the ground that as matter of law the life-tenant could not legally, in this case, lease the right to box, cut, and work the timber for turpentine purposes." The exception is to this judgment.

*Titus & Dekle,* for plaintiffs in error. *Branch & Snow,* contra.

ATKINSON, J. 1. Under a proper construction of the judgment granting the interlocutory injunction, the trial judge did not consider the conflict of evidence, but, viewing the evidence in its most favorable light for the defendants, decided as a matter of law that they did not have the right, as lessees of the life-tenant whose term had not expired, to work the trees growing upon the land for turpentine purposes. Under one phase of the conflicting evidence, the trees growing upon the land were being worked for turpentine purposes under leases executed by the testator at the time the will was executed and at the time of his death; and the manner in which the defendants are now working the trees for such purposes is less injurious to the trees than was the manner of operating under the old process which was in vogue during the life of the testator, and is not destructive of the trees. Under these circumstances. the correctness of the judgment involves two questions of law which it is proper to decide, both of which are controlling. First, has a tenant holding under a devise of land " during widowhood " the right to use the land and pine trees growing thereon, by hacking and otherwise working the trees for turpentine purposes, as against a person entitled in reversion, where prior to his death the testator used the land and trees for such purposes? Second, conceding that the land was not being so used by the testator, is the working by such tenant for turpentine purposes (which consists in cutting series of streaks on the body of the tree extending through the bark, in such manner as to make one exposed surface or more according to the size of the tree and causing the crude gum to exude at such exposed surface and deposit in metal cups attached to the tree, from which it is collected and carried away to be distilled and sold), so injurious to the tree that such use must be held, as a matter of law, to be waste as against a person entitled in reversion? It

is declared in the Civil Code, § 3684, that estates for widowhood are subject to the same rules as life-estates. Among the rules applicable to life-estates are the provisions of the Civil Code, § 3666, which is as follows: " The tenant for life is entitled to the full use and enjoyment of the property, so that in such use he exercises the ordinary care of a prudent man for its preservation and protection, and commits no acts tending to the permanent injury of the person entitled in remainder or reversion. For the want of such care, and the willful commission of such acts, he forfeits his interest to the remainderman, if he elects to claim immediate possession." This law was included in the Code of 1863 (§ 2235), which was regularly adopted by the legislature, and also included in the several subsequent codes, some of which have likewise been adopted by the legislature; and consequently it has all the binding effect of a statute. *Central of Georgia Ry. Co.* v. *State,* 104 *Ga.* 831 (31 S. E. 531, 42 L. R. A. 518). This code section was construed in *Woodward* v. *Gates,* 38 *Ga.* 205, where it was said (p. 213): " This section of the Code declares that the tenant-for-life is entitled to the *full* use and enjoyment of the property, so that, in such use, he exercises the *ordinary care of a prudent* man for its preservation and protection, and commits no acts tending to the permanent injury of the person entitled in remainder or reversion. In determining what amounts to waste, regard must be had to the condition of the premises, and the inquiry should be, did *good husbandry,* considered with reference to the custom of the country, require the felling of the trees, and were the acts such as a judicious, prudent owner of the inheritance would have committed? " Again, in *Roby* v. *Newton,* 121 *Ga.* 679, 682 (49 S. E. 694, 68 L. R. A. 601), it was said: " While the section of the code does not use the terms ' permissive waste ' or ' voluntary waste,' or the term ' waste ' at all, still an analysis of that section will indicate that its author had in mind the distinction between the two classes of waste. It imposes upon the life-tenant the duty of exercising the ordinary care of a prudent man for the preservation and protection of the estate, and the failure to do this is permissive waste; and it also prohibits the commission of any act tending to the permanent injury of the person entitled in remainder or reversion, and the commission of such acts is voluntary waste." And in *Bell* v. *Simkins,* 113 *Ga.* 894, 896 (39 S. E. 430), it was held that: " A tenant for life who holds the estate

without impeachment for waste is not liable at law to a remainder-man for waste committed, though he may be restrained by a court of equity, at the instance of a remainderman, from committing further acts of waste in the future which are destructive of the inheritance, or are of a wanton and malicious nature." In the course of the opinion it was said: " One who creates a life-estate for the benefit of another, either by will or by deed, may, if he sees proper, provide that the tenant for life shall not be held liable for waste. Such a tenant is characterized as a tenant for life who holds without impeachment for waste. No matter what may be the character of the waste committed, no one interested in the property has a right to call such a tenant into a court of law on account of his conduct. If a particular tenant exercises this power in an unconscientious manner, a court of equity may interfere to restrain him, and a waste committed by such a tenant which would be enjoined by a court of equity is called equitable waste; but a life-tenant who holds the estate without impeachment for waste is not liable for acts of waste except those which are destructive of the inheritance or wanton and malicious in their character. Bisp. Prin. Eq. § 434; 28 Am. & Eng. Enc. L. (1st ed.) 864; 12 Enc. Laws of Eng. 536; *Dickinson* v. *Jones,* 36 *Ga.* 105."

In applying this statute regard must be had for the provisions of the instrument creating the life-estate and the nature of the property in which the life-estate was given, and the use to which it was put at the time the will was executed and when it went into effect. If a testator, having nothing but a turpentine farm which was a going concern, bequeathed that to his wife during widowhood, it could hardly be said that the testator intended that she should take nothing under the will; yet that would be the effect if the trees on the farm could not be worked at all for turpentine purposes. The trees constituted a part of the realty (*North Georgia Co.* v. *Bebee,* 128 *Ga.* 563, 57 S. E. 873), but not more than minerals in the land. By the great weight of authority in other jurisdictions a tenant for life may remove for his own profit minerals from mines which were open at the time the life-estate was created. By analogy the same rule has been applied when the life interest related to timber estates. In Bartlett *v.* Pickering, 113 Maine, 96, 99 (92 Atl. 1008), it was said: " It is undoubtedly true that the general rule is that trees cut and sold are treated as principal and not as

income, and that a life-tenant is guilty of waste in cutting trees. But we think this rule is not applicable to trees on ' wild land ' so called in this State, which is kept and held merely for the produce of salable timber. These lands are held for income-producing purposes, and the only income derivable from them ordinarily comes from the cutting and sale of marketable timber trees. The bequest of the income of the trust estate in this case, consisting, as it did, in considerable part of timber-lands, contemplated, we think, that the income should be obtained from the cutting of trees, or the sale of the stumpage rights. See Drown *v.* Smith, 52 Maine, 141; McNichol *v.* Eaton, 77 Maine, 246; Honywood *v.* Honywood, L. R. 18 Eq. Cas. 306. A similar rule has been applied to the rights of life-tenants in analogous cases of iron, coal, oil and gas mines, opened in the lifetime of the testator, even when the exercise of the right might in time exhaust the mine, and practically destroy the estate of the remainderman. Gaines *v.* Green Pond Iron Min. Co., 33 N. J. Eq. 603; Sayers *v.* Hoskinson, 110 Pa. St. 473 [1 Atl. 308]; Koen *v.* Bartlett, 41 W. Va. 559 [23 S. E. 664, 31 L. R. A. 128, 56 Am. St. R. 884]." See also, on the subject, Dashwood *v.* Magniac, 64 Law Times New Series, 99; Poole *v.* Union Trust Co.. 191 Mich. 162 (157 N. W. 430, Ann. Cas. 1918E, 622); Rutherford *v.* Wilson, 95 Ark. 246 (129 S. W. 534, 37 L. R. A. (N. S.) 763); Swayne *v.* Lone Acre Oil Co., 98 Tex. 597 (86 S. W. 740 (69 L. R. A. 986, 8 Ann. Cas. 1117); Phillips *v.* Smith, 14 Mees. & W. 589; 21 C. J. 951, notes 64, 65; Ballentine *v.* Poyner, 3 N. C. 130; Beam *v.* Woolridge, 3 Pa. County Court Reports, 17; Williard *v.* Williard, 56 Pa. St. 119, 128. In the report of the last-cited case, it was said: " In considering the question of waste by a life-tenant, respect must be had to the nature of the property. Here the evidence proves clearly that the tract was bought by Jacob and John as timber land, that this was its chief value, and that they were both engaged in cutting and rafting timber from it. The timber was the intended source of profit, and the parties treated it accordingly. It is difficult to draw a distinction in this respect between profits actually drawn by the owner from the timber where it is the source of profit, and profits drawn from opened mines. Timber is no more a fixed part of the realty than coal or other minerals, and yet a life-tenant may mine without limit from opened mines." In North Carolina the same principle has been applied where dower

was set apart to a widow in lands on which the trees were being worked for turpentine purposes at the time of the decedent's death. Carr *v.* Carr, 20 N. C. 317. From the standpoint of the evidence tending to show that at the time the will was executed, and at the time of the death of the testator, the wooded lands of the testator were being worked for turpentine purposes, the widow would be entitled, under the devise, to work the land for such purpose during her widowhood.

2. If the lands were not so worked for turpentine purposes by the testator so as to bring the case within the principle above discussed, it would nevertheless be a question for the jury, under the conflicting evidence, to say whether the working of the trees was such a permanent injury to them as was beyond the rights of the defendants as lessees of the widow during the existence of her term. In a somewhat similar case it was said in Drake *v.* Wigle, 24 Upper Can. C. P. 405: "It is a question of fact for a jury, what extent of wood may be cut down in such cases, without exposing the party to the charge of waste." Again it was said in Campbell *v.* Shields, 44 Upper Can. Q. B. 449: "It is a question for the jury whether the tapping of trees for sugar making has the effect of destroying the trees, or of shortening their life, or injuring them for timber purposes." In the recent case of *Gleaton* v. *Aultman,* 150 *Ga.* 768 (105 S. E. 445), being a suit by remaindermen to enjoin the lessees of a life-tenant from working the trees for turpentine purposes, it was held that the judge did not abuse his discretion in granting an interlocutory injunction. This was an implied ruling that the question of injury to the trees was one of fact. It follows that the judge erred in holding, as matter of law, that the plaintiffs were entitled to an injunction.

*Judgment reversed. All the Justices concur.*