F. E. GRIFFITH AND T. F. SMITH, CO-PARTNERS DOING BUSINESS AS GRIFFITH & SMITH, C. D. FRINK, AND WEST FLORIDA NAVAL STORES, A CORPORATION, *Appellants*, v. E. HULION, *Appellee*.

Division B.

Opinion Filed November 23, 1925.

1 Under Section 3505 of the Revised General Statutes of Florida, 1920, providing a lien in favor of employes of "merchants, transportation companies and other corporations," a "woods rider" or overseer of the work in the woods for a private person who was a turpentine operator, cannot on the theory that such operator was a merchant, claim a lien on the turpentine and rosin produced on the place for his services as such woods rider merely because the turpentine operator ran a small commissary in connection with his business which the woods rider looked after occasionally when the operator was away.

2. The terms of the act of June 14, 1921, Chapter 8474 of the Laws of 1921, amending Section 3505 of the Revised General Statutes of Florida, 1920, are broad enough to give a lien to a woods rider or overseer of the work of the laborers in the woods, in the chipping of the trees, dipping of the gum, etc., for a turpentine operator upon the personal property of the

latter upon which labor or services are performed or which is used in the business, occupation or employment in which the labor or services are performed, after the effective date of the act; his work as overseer being so closely related to the performance of the manual labor as to become in effect a part thereof, and the legislature by using the term "services" evidently intending that the act should not be confined to the protection of those performing only manual labor.

3. Section 3505, as amended by Chapter 8474, of the laws of 1921, is not in conflict with Section 22 of Article 16 of the Constitution.

4. Section 3506 of the Revised General Statutes of 1920, which provides a lien "in favor of any person performing any labor in, or managing or overseeing, the cultivation or harvesting of crops, upon the crops cultivated or harvested," was enacted for the benefit of agricultural laborers, their managers or overseers, and cannot be construed as embracing persons engaged in the turpentine industry.

5. The "scrape" or turpentine gum which hardens on the tree and which has never been detached therefrom, partakes of the nature of the tree, and constitutes realty rather than personalty, though the gum which has been severed from the tree and caught in boxes ready to be dipped is personal property. The lien provided by said section 3505 as amended, being confined to personal property, does not attach to the "scrape" on the trees.

6. The lien provided for by section 3505, as amended, and which in behalf of the persons performing labor or services thereon, attaches to the crude, or "dip," turpentine, produced by their labor or services, is not destroyed by the change in the distillery to the form of spirits of turpentine or rosin, but such lien continues and attaches also to the latter, and may be enforced against the same.

7. Where a mortgage covers the trees and therefore the sap in the trees, before it is severed therefrom by artificial means and caught in boxes in the form of crude or "dip" turpentine, and also covers the same after it has been so changed into the

form of personal property, and distilled into spirits of turpentine and rosin, and such mortgage was executed by the owner and recorded before the services of a turpentine woods rider or overseer for such owner began, the mortgage had priority over the lien of such woods rider on such spirits and rosin although made out of the crude turpentine on which his services had been performed; the statute providing that his lien should be prior in dignity only to all others "accruing thereafter."

An Appeal from the Circuit Court for Holmes County; D. J. Jones, Judge.

Decree reversed.

*Watson & Pasco,* for Appellants;

*Jas. N. Daniel* and *C. R. Mathis,* for Appellee.

BROWN, J.—Appellee Hulion exhibited his bill for the enforcement by foreclosure on certain real and personal property of a lien claimed by him for certain work done by him as a "woods rider" for defendant Frink on a turpentine place formerly belonging to Frink and which had been sold and conveyed by the latter to defendants Griffith and Smith subject to a mortgage claimed to have been executed by Frink to the West Florida Naval Stores Company prior to Hulion's employment. The purchasers, Griffith and Smith, the vendor Frink and the said mortgagee, Naval Stores Company, were all made parties defendant. Defendant Frink suffered a decree *pro confesso* to be entered against him, but the other defendants filed a joint answer, embracing a demurrer to the bill, admitting the execution and existence of the mortgage and setting up among other things that at the time of the transfer by Frink to Griffith and Smith, Frink was due the Naval Stores Company a large amount on said mortgage, which had duly

been filed for record some length of time before Hulion's employment; that said mortgaged property was not worth anything in excess of the mortagage debt; and that said mortgage had priority over any claim or lien that Hulion may have had on the property, and expressly denied that Hulion had any lien.

The court on final hearing on pleadings and proof rendered a decree in favor of the complainant, ascertaining the amount of the indebtedness, due him, and allowing him a ten per cent attorney's fee, as prayed in the bill, and decreeing that complainant had a first lien securing said indebtedness on a part only of the property described in the bill, superior in dignity to any lien held by any of the defendants, and directing foreclosure sale of said property, to-wit: 20 barrels of spirits of turpentine, 60 bbls. of rosin, 6 bbls. of crude dip, and all the scrape which, at the time of the writ of the attachment, was upon the pine trees, upon the described lands so sold by Frink. From this decree the defendants with the exception of Frink, took this appeal.

As to the nature of his work, appellee alleges in his bill as follows:

"That the character of work which your complainant was employed to perform under said contract was to ride the woods and look after and superintend the chipping of trees and the dipping of the gum and getting same to the still, to have general superintendence of the hands in the woods and those in charge of the hauling of the gum to the still, and keeping the time of the other employees in connection with the still operations, and to look after the commissary."

It appears therefore that Hulion's services did not embrace the distillery work, but ended when the crude turpentine was hauled to the still.

(1) Appellee claimed a lien on said property for such

services from November 11th, 1920, to July 11th, 1921, the date of the sale of the place by Frink, under sections 3505 (amended by chapter 8474 of the Acts of 1921, p.194) and 3506 of the Rev. Gen. Stats. of Florida, 1920.

These sections are among a number of sections prescribing liens in favor of certain named classes of persons, preceded by the general statement in section 3502: "Liens prior in dignity to all others accruing thereafter shall exist in favor of the following persons, upon the following described personal property, under the circumstances hereinafter mentioned, to-wit:" and section 3505, before amendment, read as follows:

"3505. For labor as bookkeeper, clerk, etc. In favor of bookkeepers, clerks, agents, porters and other employees of merchants and transportation companies and other corporations; upon the stock, fixtures and other property of such merchants, companies or corporations."

Strictly speaking, Frink was neither a merchant, a transportation company nor a corporation. He was operating a turpentine business, and in connection therewith ran a small commissary. If, giving this section a very liberal construction, it be held that the operation of the commissary made Frink a merchant within the meaning of the statute as to that particular department of his business, the evidence showed that Hulion's services in connection with the commissary were so very occasional as to be almost negligible, and it would be practically impossible on this record to apportion what amount of services and what compensation, or lien, he would have been entitled to on that score. This statute would not give Hulion a lien for his services as "woods rider" on Frink's turpentine place, which was his real employment and occupation, merely because Frink also operated a small commissary which Hulion looked after occasionally when Frink happened to be away. The law does not favor such indirection. Warburton v.

Coumbe, 34 Fla. 212, 15 South. Rep. 769. The case of First National Bank v. Kirby, 43 Fla. 376, 32 South. Rep. 881, is not in point here because that case dealt with employes of a corporation, as to which the statute applied without regard to the character of business engaged in.

(2) But we are of the opinion that the terms of the amendment to section 3505 of June 14th, 1921, which are quite comprehensive in their scope are broad enough to give appellee a lien for services rendered between the effective date of the amendatory act, June 14th, 1921, to the time of the termination of his employment on July 11th, 1921, a period of approximately four weeks, for services performed upon the classes of personal property described in the amendatory act, and which appear to embrace the property covered by the decree, with the exception of the scrape hereafter mentioned, it having been shown by the evidence that Hulion's services pertained to the production of such personal property. The amendatory act reads.:

"3505. For labor as Bookkeeper, Clerk, etc. In favor of persons performing labor or services for any other person, firm or corporation, upon the personal property of the latter upon which the labor or services is performed or which is used in the business, occupation, or employment in which the labor or services is performed."

While Hulion's services were in the nature of those of a foreman or overseer of the laborers who actually did the work of chipping the trees, preparing the boxes, dipping the gum from the boxes, etc., under his immediate superin-. tendence, the statute covers "services," as well as labor, upon the personal property described in the act, and his work was so closely related to the performance of the labor that it became as it were a part of the work itself, and constituted "services" upon such personal property within the meaning of the statute. Palm Beach Bank & Trust Co. v. Lainhart, 84 Fla. 662, 95 South. Rep. 122; Bank v.

Kirkley, 43 Fla. 376, 386, 32 So. 881; 27 Cyc. 43. By employing the terms "services," the legislature evidently intended that the act should not be confined to the protection only of those performing strictly manual labor.

This amendatory act provided in a second section that it should become effective upon becoming a law. It was approved on June 14, 1921, and hence became effective on that date. Parker v. Evening News Pub. Co., 54 Fla. 482, 44 South. Rep. 718. Of course no lien could be claimed thereunder for services or labor rendered prior to its going into effect. Warburton v. Coumbe, *supra*.

(3) While the scope of this amendatory act is broader than the mandate to the legislature contained in Section 22 of Article 16 of the Constitution, we do not regard it as being in conflict therewith. This section reads:

"The legislature shall provide for giving to mechanics and laborers an adequate lien on the subject matter of their labor."

Under the well known rule that, unlike the Federal Constitution, the State Constitutions are regarded as in the nature of limitations upon, rather than grants of power to enact, legislation, the State legislatures being free to enact such laws as they deem wise and necessary, so they do not conflict with the express or implied inhibitions of the Federal Constitution or the Constitution of the particular State, we consider this statute well within the legislative province and powers. The Constitution in this instance directs the legislature to do certain things, but does not inhibit it from going further and enacting other legislation in connection with or in addition to that which is commanded.

(4) Appellee also relies for a lien upon Section 3506, which reads as follows:

"3506. For labor in raising crops.—In favor of any person performing any labor in, or managing or overseeing,

the cultivation or harvesting of crops; upon the crops cultivated or harvested.''

This section was plainly enacted for the benefit of agricultural laborers, their managers and overseers. The use of the word ''crops'' in connection with the words ''cultivation or harvesting,'' especially the word ''cultivation,'' removes all doubt on this subject, as a reference to the dictionary will reveal. The chipping, scoring or streaking of pine trees, by which the bark is torn away and the fiber of the tree exposed, so as to induce the flow therefrom of the sap or crude turpentine, rather than being a process of cultivation, is a process destructive in its nature, however beneficial in its results to mankind the lesion thus produced on the tree may be. There is no tilling of the ground or fertilizing of the soil around the tree, but destruction of a portion of the tree in order to obtain the annual flow of the valuable sap which nature has already produced in its body.

In the case of Richbourg v. Rose, 53 Fla. 173, 44 South. Rep. 69, reference is made to the ''turpentine crop,'' and that it was the product of ''labor and cultivation,'' but the point decided was, not that the production of turpentine constituted a crop within the meaning of this statute, but that the crude turpentine, after its separation from the parent tree and its catching in the boxes ready to be dipped up, constituted personal property rather than realty and hence was subject to recovery in replevin in certain circumstances; and from this conclusion there can be no dissent. To hold that this section of the statute embraces the turpentine industry would be to do violence to the plain and commonly accepted meaning of the language used. See 17 C. J. 378, 84; 8 R. C. L. 354-7; 2 Words & Phrases 1755; United States v. Waters-Pierce Oil Co., 196 Fed. Rep. 767. Fortunately for the present protection of those persons performing ''labor or services'' in the production of those valuable commodities known as turpentine, rosin and naval

stores in this State, no such strained construction need be asked, as such protection appears to be adequately afforded by the amendment to section 3505, as hereinabove shown.

(5)    The decree in this case attempted to apply the appellee's lien to the "scrape" on the trees when the attachment was levied.    This could only be legally done provided such scrape was personal property.    In the Richbourg v. Rose case, *supra*, though the question was not there involved, it was observed in the opinion that, "Crude turpentine which has formed on the body of the tree, and is called 'scrape,' is said to be personal property."    Citing several North Carolina and one Missouri case.    These cases depart from the usual and long-established principle involved.    The scrape is that part of the sap which in exuding from or trickling down the tree, continues to adhere thereto, and there hardens, never becoming detached from the tree and dropping into the box as is the case with the so-called "dip."

Until it has been detached from the tree, by artificial means, the "scrape" remains a part of the tree, and sound general principles of law requires us to hold that in the absence of a statutory provision to the contrary, or of special contract provisions which would operate to make it constructively personal property, it would partake of the nature of the tree from which it has never been actually separated, and thus constitutes realty.    See 8 R. C. L. 356; 27 Cyc. 1144, 1728; Simmons v. Williford, 60 Fla. 359, 53 South. Rep. 452; Florala Sawmill Co. v. J. T. Parrish, 155 Ala. 462, 46 South. Rep. 461.

(6)    The lien attaching to the crude or "dip" turpentine which was produced by the "services" of Hulion and the laborers under him after the amendment to Section 3505 went into effect, was not destroyed by the process of distilling, etc., by which its form was changed into spirits of turpentine and rosin, but the lien followed and attached to the

commodity in its refined state.  It still remained personal
property on which the labor and services had been per-
formed.  How much of the crude dip was produced by such
labor or services after the amendatory act went into effect
is not shown by the record, but by the terms of such act it
gave a lien upon the personal property of the employer
"upon which the labor or services is performed, or which is
used in the business, occupation or employment in which the
labor or services is performed."  It would defeat the plain
purpose of the statute to hold that the lien was lost *inter
partes* by changing the form of the product from crude tur-
pentine to rosin by the same employer and on the same
place.  Hulion testified positively that the property was
purchased by Griffith & Smith with notice of his lien.  The
court below was without error in this regard.  There was
not such a technical conversion as would destroy the lien.
See 37 C. J. 338, 342, and 25 Cyc. 1589.

(7)   The question as to whether the mortgage set up in
the answer had priority over the lien of appellee upon the
spirits and rosin for services performed is very zealously
and ably argued by counsel for both appellants and ap-
pellee.  It is contended by appellee that the mortgage,
though prior in date of execution and record to Hulion's
employement by the mortgagor, was subsequent in the time
of its attaching to the property involved; that Hulion's
lien attached from the time the "streaks were made on the
trees and before the spirits and rosin came into existence
that the crude gum came into existence impressed with a
lien in favor of Hulion; that therefore the lien of Hulion
came before the mortgage attached to such spirits and rosin,
under the after acquired property clause in the mortgage.

It appears from the record in this case that the mortgage
covered certain lands owned by Frink, and his leases of the
timber or trees upon certain other lands, on which, the
owned and leased lands, he located his plant and conducted

his turpentine operations, and the personal property on the place as well; and a stipulation was entered into, in lieu of introducing the mortgage in evidence, giving the date and amount of the mortgage and stating that it "covered the property involved in the litigation." There was evidence to the effect that the mortgage debt largely exceeded the value of the mortgaged property. The appellee argued the case on the assumption that the mortgage contained an after acquired property clause. This does not expressly appear, but it is probably a natural inference from the record.

Appellee cites as authority for his position the case of Bear Lake & River Waterworks & Irrigation Co. v. Garland, 164 U. S. 1, 41 L. Ed. 327, 17 Sup. Ct. Rep. 7, wherein it is said: "Even under the after acquired property clause, if the mortgaged property be burdened with an encumbrance or lien at the very time of coming into the possession or ownership of the mortgagor, such incumbrance remains prior or superior to the lien of the mortgage, although it was actually subsequent thereto in point of time." While there are some passages in the opinion in that case which support appellee's contention, a reading thereof discloses that in that case, which was one to fix a contractor's lien upon a canal property, the mortgagor's title did not, under the statute, vest until the canal was completed, which was of course after the work for which the lien was claimed had been done. In its opinion the court says, "'The point is that the mortgagor never had any claim or title, of a legal or equitable nature, to the land upon which the work was done during the whole time that the work was going on, and when the title did thereafter vest in the Bear Lake Company by virtue of the work done by Carey Bros. & Co., it became burdened with the lien. created by virtue of the work so done upon it. If prior to the doing of the work the Bear Lake Co. had simply purchased the land, and entered

into such agreement with the owner thereof as gave it an equity to the same, then the property would not have come to the Bear Lake Co. burdened with any lien, and the work thereafter done upon it in the shape of digging the ditch, etc., would not have given ground for any priority of lien as against the mortgage of the Trust Company.''

As we understand this record, Frink, the mortgagor, owned the trees and the sap in the trees, and the mortgage had been executed and recorded, before Hulion was employed or did any work. The mortgage attached to the sap in the trees before its extraction thereform, and the change in its form, first into crude dip, and later into spirits and rosin, while it involved a change in form from realty into personality, did not destroy the lien of the mortgage any more than the change in form from crude dip to spirits and rosin destroyed Hulion's lien, as herein above held. The mortgage attached to the property in both forms as realty and also as personalty, while the statute only gave Hulion a lien on it after it became personal property. If the mortgage had not attached until the property was brought into the form of personalty by Hulion's work, a different question would be presented. 27 Cyc. 240. If we considered this question purely from the standpoint or basis of the stipulation, the conclusion could hardly be otherwise. The stipulation admits that the mortgage covered the property involved, and that it was made prior to Hulion's employment and services.

As was well said by this court, speaking through Mr. Justice WHITFIELD in People's Bank of Jacksonville v. Arbuckle, 82 Fla. 479, 90 South. Rep. 458, ''The question to be here determined is not what the policy and purpose of statutes should be in providing for material men's and laborers' liens, but what is the intent of the law makers of the State as shown by the language of the statute now being interpreted.

The intent of a statute is the law, and that intent should be duly ascertained and effectuated." Continuing, (on page 460 of 90 South. Rep) the court said, "our statute specifically provides that "the lien hereinbefore provided for shall be acquired" by any person in privity with the owner, "by the performance of the labor or the furnishing of the materials," and that such liens are "prior in dignity to all others accruing thereafter." If the performance of the labor or the furnishing of the materials is begun after a mortgage lien is executed and recorded, the mortgage lien had priority, since the due record of the mortgage is notice to third persons, and statutory lien is superior only to 'liens accruing thereafter,' and statutory liens shall be acquired * * * by the performance of the labor or the furnishing of the materials; which, if begun after the recording of the mortgage lien, must make the statutory liens accrue after the mortgage lien, and consequently subject to it. The recording of the mortgage affords notice thereof to all concerned, and gives it priority over all liens accruing thereafter." This decision is in line with the prevailing construction of such statutes by the courts of other jurisdictions unless the statute clearly shows an intent that the statutory lien shall override prior liens, the prior liens when there are such duly of record, must prevail. 27 Cyc. 236; 37 C. J. 329. See also Palm Beach Bank & Trust Co., v. Laimhart, 84 Fla. 662, 95 South. Rep. 122, where this rule is reaffirmed and its application ably treated in the opinion written by Mr. Justice Ellis.

The decision of the questions above discussed renders consideration of the other assignments of error unnecessary.

The decree of the court below will be reversed.

WHITFIELD, P. J., AND STRUM, J., concur.

WEST, C. J., AND ELLIS AND TERRELL, J. J., concur in the opinion.