### UNITED STATES v. TURNER TURPENTINE CO. et al.
#### No. 9306.
Circuit Court of Appeals, Fifth Circuit.
April 15, 1940.

Thomas G. Carney and Sewall Key, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and T. Hoyt Davis, U. S. Atty., of Macon, Ga., for appellant.

Harley Langdale, J. Lundie Smith, Jr., and B. Lamar Tillman, all of Valdosta, Ga., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellees, owners and operators of a Georgia turpentine farm, first sought unsuccessfully[1] to enjoin the assessment and collection of taxes under the Social Security Act, U.S.C., Title 42, Sections 1001, 1004, 1007 and 1101, 42 U.S.C.A. §§ 1001, 1004, 1007, 1101, then paid the taxes[2] and brought this suit for their refund. Upon the facts which were without dispute, the District Judge thought that the labor with regard to which the taxes were imposed and collected, to-wit, the production of gum from oleoresin by the scarification of living pine trees and its processing into gum spirits of turpentine and gum rosin, was "agricultural labor" within the exception of Section 811 of the act, U.S.C., Title 42, 42 U.S.C.A. § 1011; that the taxes had been wrongfully exacted and must be refunded; and on full findings of fact[3]

---

[1] Allen v. Shelton, 5 Cir., 96 F.2d 102.

[2] $60.41 for 1936. $3.82 on account of wages paid employees engaged principally in the operation of the stills; and $56.59 to him on account of employees engaged principally in agriculture, chipping and scarification of the trees or dipping the gum; and $37.52 for 1937; $0.80 on account of still employees; $36.72 on account of the others.

[3] Findings of Fact—1. The complainants reside in the Valdosta Division of the Middle District of Georgia.

2. Complainants are engaged in turpentine farming (hereinafter described) and with respect to labor employed by them in that connection made the following payments to W. E. Page, then Collector of Internal Revenue, now deceased:

(a) Excise tax imposed upon employers by Section 901 of Title IX of the Social Security Act:

March 30, 1937 .............$60.41

(b) Excise tax imposed upon employers by Section 804 of Title VIII of the Social Security Act:

April 1, 1937 ................$13.93
April 26, 1937 ................ 6.96
June 1, 1937 ................ 5.08
July 6, 1937 ................ 11.55

6. Complainants' turpentine farming operations are carried on in the following manner.

The first step in actually extracting oleoresin is the hanging of a light cup, either of clay or galvanized metal on the surface of the tree. No "box" or receptacle for the collection of the oleoresin is cut into the tree. Streaks through the bark and into the wood are chipped off just above the cups with a very sharp "U" shaped axe, known as a hack. These streaks slant from each side of the tree towards the cup, and are only one-half to three-fourths of an inch deep. One such streak is added to the tree each week during the working season, thus forming an "M" shaped face or scar just above the cup.

Prior to this scarification, the tree contains very little crude gum. When the tree is scarred a natural process is set up within the tree which produces the crude gum and at the same time tiny veins or ducts, known as rosin ducts, are formed between the outer layers of wood just above the scarred surface. These ducts convey the gum to the scarred face where the gum forms a protective film in an effort to heal the wound. Unless the scarification is continued the production and flow of gum will then cease. By the periodical streaking the rosin ducts are multiplied and the production and flow of gum is stimulated and increased.

The crude gum or oleoresin produced by this periodical cultivation oozes over the scarred face and drips into the cup and every three or four weeks is gathered and taken to the still.

In gathering the gum, the laborers dip it from the cups with small paddles and put it into buckets. The buckets are in turn poured into barrels which are picked up by wagons or trucks and taken to the still.

The still is a crude apparatus consisting principally of a large boiler and a water cooled coil. The gum is placed into the boiler and heated. No chemicals are used and no chemical reaction takes place. The stilling process results merely in a physical separation of the turpentine and rosin. The turpentine evaporates when heated and passed into the cooling coil, where it is condensed and runs out into barrels or tanks. The ros-

and conclusions of law[4] he gave judgment for appellees. This appeal finds no fault with the fact findings. But it does assail the conclusions of law and the judgment

in is then drawn from the boiler, strained and put into barrels. The products are then ready for market. No skilled labor is necessary in the operation of a still, and no skilled labor is used. The stiller is an ordinary laborer of the same class as other farm laborers.

The vast majority of laborers employed on claimants' turpentine farm are engaged principally in the woods chipping or scarifying the trees and dipping or gathering the gum. The still is operated by one or two men who are employed at the still usually only a part of their time; during the remainder of their time they do other types of work about the turpentine farm.

The labor performed by claimants' said employees is of the class and is similar to the labor of employees on farms which produce other agricultural commodities but no turpentine. The relationship between petitioners and their said employees and the relationship between farmers who produce no turpentine and their employees are the same, and the labor conditions on petitioners' said turpentine farm are similar to the labor conditions existing on farms in the same locality which produce no turpentine.

The labor is of a transient nature, and employees customarily remain on a turpentine farm for only a limited period of time. These employees frequently change their names in moving from one turpentine farm to another.

Gum turpentine is a seasonal crop. The principal gathering season is during the summer months. The gum flows more freely in warm weather. About sixty per cent of the year's crop is produced during the months of May, June, July and August. During the winter months very little gum is produced. Like other farm crops the production of turpentine is affected by weather conditions. In very dry years the trees do not produce gum rapidly and the crop is therefore smaller. When it rains much during the harvest season, the streaks on the trees heal rapidly and prevent the flow of gum. More gum is produced during long hot summers than during comparatively short cool summers. The same weather conditions which produce a good cotton crop will likewise produce a good turpentine crop.

Complainants' operations are not confined to the natural growth of timber. Precautions are taken by complainants to protect their trees from fire. "Fire breaks" consisting of criss-cross furrows plowed through the woods are a vital element in this protection. Underbrush is cut away as a further measure. Complainants practice what is known as "control burning", which consists of supervised periodic burnings of underbrush. This practice not only reduces the hazard from wild fire, but actually stimulates the growth of standing trees by making available to them soil sustenance formerly consumed by underbrush and also stimulates the growth of standing trees by adding to the soil certain chemicals calculated to stimulate growth.

In addition to the above mentioned activities of complainants in connection with the care and growth of turpentine trees, complainants have, during the past several years, planted and cultivated more than 100,000 such trees. These trees are planted in fields which were formerly confined to the production of other farm crops. The land is usually plowed and prepared for planting in a manner similar to the preparation of land for other farm crops. The trees are then planted in rows and are so placed as to produce trees the size and shape best suited for turpentine purposes. During the first few years of the trees' lives they are plowed and cultivated. This cultivation accomplishes a two-fold purpose. It stimulates the growth of the trees and eliminates undergrowth which, if allowed to accumulate, would both create a fire hazard, and deprive the trees of needed sustenance.

The employees who, during the producing season, are engaged in scarifying trees, gathering gum and operating the still, are, during the winter, engaged in plowing "fire breaks", cutting away underbrush, control burning and planting and cultivating young trees. None of the trees so planted and cultivated by plaintiff have been turpentined.

4 Conclusions of Law—3. The labor employed by complainants in the production of crude gum or oleoresin by the scarification of living pine trees and in processing the crude gum or oleoresin so produced into gum spirits of turpentine and gum rosin is "agricultural labor" within the purview and meaning of the term as used in the Social Security Act.

4. Since "agricultural labor" is exempted from the provisions of the Social Security Act, no tax is imposed upon complainants by said Act with respect to the labor employed by them in the production of oleoresin, gum spirits of turpentine and gum rosin. And the taxes demanded of and paid by complainants were erroneously and illegally assessed and collected, and complainants are entitled to have the same refunded.

for appellees as unsupported by the facts they purport to rest on and as directly in the teeth of the decisions,[5] statutes[6] and rulings[7] it cites and relies on, and particularly of the Social Security Act amendment, approved August 10, 1939, effective January 1, 1940, 42 U.S.C.A. § 1011, specifically setting forth the content of the term agricultural labor as used in the act and embracing in that content, labor employed in turpentine farming operations of the kind in question here.

Appellees vigorously dispute this. They point out that none of the decisions relied on had to do with statutes or situations like the one at bar; that the statutes, (except the Social Security Amendment of 1939) and the Attorney General's opinion, appellant relies on as persuasive, are really not in point; that the cumulative bulletin is of no force as authority because its correctness is the very question now for decision; while the Act of Congress in 1939 in amending the Social Security Act to specifically declare the content of the term "agricultural labor", instead of aiding appellant on the question, defeats it. For, a clarifying act, it not only by precise definition, includes the labor in question as "agricultural labor", but it takes the definition from the Agricultural Marketing Act as amended in 1931 and of force when the original Social Security Act was passed. In addition, appellees cite in affirmative support, lexicographers, treatises and decisions giving the term "agriculture", at the time the act was passed and now, a meaning broad enough to include turpentining, and statutes of the United States and of the turpentine raising states which show a settled legislative understanding that the term "agricultural labor", when used as here, has a content broad enough to include turpentine farming.

We agree with appellees. The federal cases appellant cites are not at all in point. They had to do with the rights and privileges of an entryman, under the homestead laws, to cultivate the land. They properly held that the cupping and boxing of pine trees under the old wasteful and destructive methods then in use, was not cultivation but "destruction", and that the destructive practices there condemned were not permitted under those laws. Pridgen v. Murphy, supra, construed the Georgia Workmen's Compensation Act, which used the term "farm laborers", and held: that the legislature had used the term in its original sense of the cultivators of land for the production of agricultural crops, and had not meant it to include turpentine operations. But the Georgia legislature at its next session, after the decision was handed down, declared[8] "the term 'agricultural commodities' and 'agricultural products' and 'farm products' shall include and embrace crude gum (oleoresin) from a living tree or trees, and the following products as processed by the original producer of the crude gum (oleoresin) from which derived."

And in 1939, Acts Ga.1939, p. 241, it specifically declared, "Every original producer * * * of crude gum (oleoresin) * * * and his employees are hereby declared to be, for all intents and purposes, farmers in so far as any statute of this State relates to farming and farmers." In the Florida case of Griffith v. Hulion, supra, decided in 1925, the question for decision was whether a turpentine woodsrider had a lien for his services. Several Florida lien statutes were discussed. Cf. Lowe v. North Dakota Workmen's Compensation Bureau, infra. One gave a lien on the goods of a merchant; one, Sec. 3506, Rev. Gen.St.1920, a lien "in favor of any person performing any labor in, or managing or overseeing, to the cultivation or harvesting of crops", another, Sec. 3505, a lien to persons performing labor or services in the production of turpentine resin. What was said in the opinion [90 Fla. 582, 107 So. 356] in rejecting the claim to a lien under Sec. 3506, "the use of the word * * * 'cultivation,' removes all doubt on this subject. * * * [The] process [is] destructive in its nature * * *. There is no tilling of the ground or fertilizing

---

[5] Union Naval Stores v. United States, 240 U.S. 284, 36 S.Ct. 308, 60 L.Ed. 644; United States v. Waters-Pierce Co., 8 Cir., 196 F. 767; Pridgen v. Murphy, 44 Ga.App. 147, 160 S.E. 701; Griffith v. Hulion, 90 Fla. 582, 107 So. 354; Mackey v. Fullerton Naval Stores Co., 4 La. App. 43; Lee & Bradshaw v. Rogers, 151 Ga. 838, 108 S.E. 371; Gleaton v. Ault-

man, 150 Ga. 768, 105 S.E. 445; Kent v. Lane, 168 Ga. 133, 147 S.E. 61.

[6] U.S.C., Title 12, Secs. 1141–1141j, 12 U.S.C.A. §§ 1141–1141j; 44 Stat. 802, 7 U.S.C.A. § 451 et seq.; 44 Stat. 1423, Sec. 1, U.S.C. Title 15, Sec. 431, 15 U.S.C.A. § 431.

[7] 36 OP.A.G. 326–342; SSF 118, 1937—1 Cum.Bull. 397.

[8] Acts Ga. of 1933, page 282.

of the soil around the tree, but a destruction of a portion of the tree in order to obtain the annual flow of the valuable sap.", was unnecessary to the decision, the court holding that plaintiff had his lien under Sec. 3505, and that therefore for his protection and that of persons performing labor or services in the production of turpentine resin, no strained construction of Sec. 3506 to bring them under it was necessary. Further after the decision of that case, the Florida Legislature in 1933, declared, "'crude turpentine gum' (oleoresin), the product of a living tree, or trees, of the pine species" and "gum-spirits-of-turpentine" and "gum resin" as processed therefrom, are hereby classified and declared to be "'agricultural commodities' * * * and 'farm products.'" Florida Sessions Act 1933, Chapter 16297.

The Louisiana case cited was one construing the Louisiana Workmen's Compensation Act, No. 20, Acts of La.1914. It merely held that the company which produced crude gum was engaged in the manufacture of resin and turpentine and its employees were engaged in a hazardous trade, within the definition of the act. The Georgia Civil cases cited, held merely that the cutting and cupping of trees by the employees of a life tenant, resulted in permanent injuries to the trees amounting to waste, and was enjoinable at the suit of the remainderman.

In further affirmative support of its position that "agricultural labor" as used in the statute covered the labor in question, appellees in addition to the Georgia and Florida statutes, cite statutes to the same effect from Alabama and Mississippi which, with Georgia and Florida produce more than 90% of the gum turpentine and resin produced in the United States. Alabama Sessions Acts, 1936, Gen.Acts Ala.1936, Ex.Sess., p. 70, declares, "The terms 'agriculture commodities,' 'agriculture products' and 'farm products,' shall include and embrace crude turpentine gum (oleoresin) from a living tree, or trees, of the pine species", while Mississippi General Laws of 1934, Chapter 301, provide, "Crude * * * gum (oleoresin) [is a] product of a living tree, or trees, of the pine species, and gum-spirits-of-turpentine and gum-rosin as processed therefrom, are hereby classified and declared to be agriculture commodities, agriculture products and farm products." Not content with state statutory support, appellees cite, the Naval Stores Act of 1923, U.S.C., Title 7, Sec. 91, 7 U.S.C.A. § 91, requiring the secretary of agriculture to establish standards for turpentine and resin, and the 1931 amendment of the Agricultural Marketing Act, U.S.C., Title 12, Sec. 1141j, 12 U.S.C.A. § 1141j(g), providing, "as used in this act [subchapter], the term 'agricultural commodity' includes in addition to other agricultural commodities, crude gum (oleoresin) from a living tree, and * * * gum, spirits of turpentine and gum rosin, as defined in the Naval Stores Act, approved March 3, 1923 [section 92 of Title 7]." In 1935, in an amendment to the Agricultural Adjustment Act, U.S.C. Title 7, Sec. 608c(2), 7 U.S.C.A. § 608c(2), Congress defined agricultural commodities so as to include "naval stores as included in the Naval Stores Act [sections 91 to 99 of this title] and standards established thereunder," (including refined and partially refined oleoresin), and this act was approved just 10 days after the Social Security Act. More recently, the Wage Hour Bill, U.S.C., Title 29, Sec. 203(f), 29 U.S.C.A. § 203(f), declared that "agriculture" includes, "farming in all its branches and among other things * * * the * * * cultivation, growing and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12, [U.S.C.A.], as amended)."

As to the 1939 amendment of the Social Security Act, we agree with appellees, that it is to be regarded as interpretative and explanatory of the term as it was used in the original act, and that it is itself a binding and final congressional declaration of what was meant by the term "agricultural labor" as there used. It is now a settled principle of statutory construction that Congress or a legislature in legislating with regard to an industry or activity, must be regarded as having had in mind the actual conditions to which the act will apply, that is, the needs and usages of such activity. When then, Congress in passing an act like the Social Security Act, uses, in laying down a broad general policy of exclusion, a term of as general import as "agricultural labor", it must be considered that it used the term in a sense and intended it to have a meaning wide enough and broad enough to cover and embrace agricultural labor of any and every kind, as that term is understood in the various sections of the United States

where the act operates. This does not mean of course, that a mere local custom which is in the face of the meaning of a general term used in an act, may be read into the act to vary its terms. It does mean however, that when a word or term intended to have general application in an activity as broad as agriculture, has a wide meaning, it must be interpreted broadly enough to embrace in it all the kinds and forms of agriculture practiced where it operates, that its generality reasonably extends to. Definitions of agriculture in standard texts and treatises and in decisions in these latter years, have had the widest content. Funk & Wagnalls defines agriculture as including horticulture, fruit raising, etc., "because agriculture is the science that treats of the cultivation of the soil." Webster's Unabridged Dictionary, 1935, declares that in a broader sense, agriculture includes farming, horticulture, forestry, dairying, sugar making, etc. The Encyclopedia Britannica, 14th Edition, Forestry as a Science, declares; "the science underlying the growing of timber crops is therefore nothing but a branch of general plant science", while the Cyclopedia of American Agriculture says of forests, "if agriculture is the raising of products from the land, then forestry is a part of agriculture." Vol. 2, page 312. From the Encyclopedia Britannica article, on rosin production, we quote the following significant passage, "The chief region of rosin production is the South Atlantic and Eastern Gulf states of the United States. American rosin is obtained from the turpentine of the swamp pine and of the loblolly pine. The main source of supply in Europe is the lands of the departments of Gironde and Landes in France, where the *cluster pine is extensively cultivated.*" (Italics supplied). An examination of the cases cited in Words and Phrases, Fifth Series, Vol. 1, p. 339 et seq., under agriculture and in 3 C.J.S., Agriculture, pages 361, 365 and 366, § 1, under "agricultural" and "agriculture", convinces that in modern usage this is a wide and comprehensive term and that statutes using it without qualification, must be given an equally comprehensive meaning. Among the cases cited, which may be consulted with profit, are Sancho v. Bowie, 1 Cir., 93 F.2d 323, holding that in the broad sense agriculture includes farming, horticulture, forestry, sugar making, etc.; Hill v. Georgia Casualty Co., Tex.Com.App., 45 S.W.2d 566, holding that an employee in a pecan nursery, was a "farm laborer" under the Texas Workmen's Compensation Act, Vernon's Ann.Civ.St.Tex. art. 8306, § 2; Forsythe v. Village of Cooksville, 356 Ill. 289, 190 N.E. 421, holding that "agriculture" is an indefinite word, including in broad sense, farming, horticulture and forestry, together with such subjects as butter, cheese and sugar making, and words, "agricultural purposes", have generally been given such comprehensive meaning, unless restricted by context of statute in which used. In re Rodgers, 134 Neb. 832, 279 N.W. 800; the term "agriculture" is broader in meaning than farming. Lowe v. North Dakota Workmen's Compensation Bureau, 66 N.D. 246, 264 N.W. 837, 838, 107 A.L.R. 973. "One may be employed in agriculture and yet not be a 'farmer' in the ordinary sense of the term, nor even a 'farm laborer' as the term is used in our lien laws. They are not synonymous terms. The term 'agriculture' is broader than either of the others." Cf. Keeney v. Beasman, 169 Md. 582, 182 A. 566, 103 A.L.R. 1515.

When due regard is had to all these definitions, decisions and statutes, including especially the 1939 amendment of the Social Security Act, we think it clear that the argument for the view that "agricultural labor" as used by Congress in the original act, "was used to include only ordinary farm labor, and therefore to exclude laborers on turpentine farms", is overborne by the weight and cogency of the arguments for the contrary view that the terms were comprehensively used. The District Judge was right in holding that appellants are not under the statute.

The judgment is affirmed.