Filed 10/27/25
Opinion on rehearing; see concurring opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| PACHO LIMITED PARTNERSHIP, et al., <br><br> Plaintiffs, Cross-Defendants, and Appellants, <br><br> v. <br><br> EUREKA ENERGY COMPANY, <br><br> Defendant, Cross-Complainant, and Respondent. | 2d Civ. No. B332160 <br> (Super. Ct. No. 19CV-0158) <br> (San Luis Obispo County) <br><br><br> OPINION ON REHEARING |

Civil Code section 717 provides, "No lease . . . of land for agricultural . . . purposes for a longer period than 51 years, in which shall be reserved any rent or service of any kind, shall be valid."[1] How many cows does it take to make a lease of the land upon which they are grazing a lease "for agricultural purposes" within the meaning of section 717? We do not know. But we do

---

[1] Unless otherwise stated, all statutory references are to the Civil Code.

know this: under the particular circumstances of this case, the lease here was not for "agricultural purposes."  The trial court erroneously ruled to the contrary.

The lease provided that it was for "any lawful purpose," but the parties to the lease understood that the 2,400-acre parcel ("the Property") would be used for cattle grazing.  The Property was subsequently used for this purpose, it can support no more than approximately 111 head of cattle, and, insofar as the parties to the lease were concerned, the purpose of the cattle grazing was not to raise livestock but to prevent wildfires.

One of the goals of the law is fairness.  The trial court unfairly invalidated the lease to the extent it exceeded the 51-year limitation of section 717.  The law abhors a forfeiture, but the trial court's ruling results in a $39 million forfeiture for the lessee and a corresponding windfall profit for the lessor.  Accordingly, in our original opinion we reversed the trial court's ruling.

In its petition for rehearing, respondent lessor protested that our original opinion contains a multitude of errors.  We granted the petition to clarify our analysis.

Respondent sees many trees, but it has missed the forest.  This appeal must be analyzed through the lens of time-honored anti-forfeiture rules.  ""'A forfeiture is '[t]he divestiture of property without compensation' . . . .'""" (*VFLA Eventco, LLC v. William Morris Endeavor Entertainment, LLC* (2024) 100 Cal.App.5th 287, 308.)  An "indicator of a forfeiture . . . is an unfair divestiture of property [here appellants' leasehold interest] that bears no relationship to the actual damages anticipated by the parties when they negotiated the contracts." (*Id*. at pp. 308-

2

309.)  When the parties negotiated the lease of the Property, they did not anticipate that it would be invalid after 51 years.

"'Forfeitures are not favored by the courts, and if an agreement [or a lease] can be reasonably interpreted so as to avoid a forfeiture, it is the duty of the court to avoid it. . . .  "A contract [or a lease] is not to be construed to provide a forfeiture unless no other interpretation is reasonably possible." . . .'" (*Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 771.)  As we explained before in our original opinion, and as we explain again here, the trial court did not follow these rules.[2]  It had a duty to avoid a forfeiture because there is a "reasonable interpretation" that the lease did not contemplate and was not designed for an "agricultural purpose."  Instead, a minimal number of grazing cows was put upon the land for fire prevention.  Of course, grazing cows will gain weight and become more valuable to their owner, but that does not inexorably mean that the lease was for an "agricultural purpose."

Pacho Limited Partnership, San Luis Bay Limited Partnership, and HomeFed Corporation (appellants), appeal from the judgments entered after a court trial.  The judgments were in favor of Eureka Energy Company (Eureka or respondent), a wholly owned subsidiary of Pacific Gas and Electric Company.

Eureka acquired title to the Property at a Sheriff's sale in 1995.  Pacho and San Luis Bay leased the 2,400 acres from the

---

[2] In its statement of decision, without explanation the trial court rejected appellants' argument that "the doctrine of forfeiture should be applied to construe the terms of the Lease in their favor."  The court stated, "Upon review of the cases cited by Plaintiffs in support of this argument, the Court concludes the doctrine of forfeiture as applied to the interpretation of contracts has no application to the present case."

predecessors of Eureka. The lease was for 99 years with an option to renew for an additional 99 years. The Property, known as "Wild Cherry Canyon," has always been used for cattle grazing. Cattle roamed across the Property and fed on the wild vegetation growing there. The lease did not specify the purpose for which the Property could be used. It stated, "The premises may be used and improved by Lessee for any lawful purpose." Pursuant to section 717, the trial court concluded that the lease was valid for only 51 years because the Property had been leased for "agricultural purposes."

The appeal raises two questions. The first is whether land leased for cattle grazing is leased for "agricultural purposes" within the meaning of section 717. The answer to this question is "generally, yes." As explained in the following paragraph, we do not rule out appropriate exceptions to the general rule. Where, as here, the lease does not specify the purpose for which the land may be used, in determining the purpose we may consider the lessee's actual use of the land. Here, the Property was continuously used for cattle grazing.

The second question is whether a lease is for "agricultural purposes" where it provides that the land may be used for any purpose and the lessee used the land for cattle grazing, but the parties to the lease understood that the grazing would not be for the purpose of raising livestock. Instead, the purpose of the grazing would be to reduce the risk of wildfires. We conclude that, under the particular circumstances of this case, such a lease is not for "agricultural purposes" within the meaning of section 717. Accordingly, we reverse.

*The Pleadings' Allegations*

4

In March 2019 the plaintiffs – Pacho and San Luis Bay – filed a complaint against Eureka. The complaint alleged: plaintiffs are the lessees of "approximately 2,400 acres of raw, undeveloped, rural, coastal real property located in an unincorporated area in San Luis Obispo County." They "are successors-in-interest to" Diablo Canyon Corporation (Diablo), which in 1968 leased the Property from Luigi Marré Land and Cattle Company (Cattle Company). Eureka is the successor-in-interest to Cattle Company and is the current lessor of the Property. "The initial term of the Lease is ninety-nine (99) years (the 'Initial Term') with the option for the lessee to renew the Lease on the same terms and conditions for an additional term of ninety-nine (99) years (the 'Option')."

The complaint continued: in 2014 appellant HomeFed Corporation "became the managing general partner of both Pacho and San Luis Bay." HomeFed purchased an "interest in the Pacho Properties based on its expectation that the length of the lease term was through and including December 26, 2166," the end of the 99-year renewal term under the Option.

In August 2018 plaintiffs gave written notice to Eureka that they were exercising the Option to renew the lease for the additional 99-year term. In response to the notice, "Eureka, for *the first time*, asserted that the Lease term is limited to 51 years pursuant to *California Civil Code* § 717 and that the Lease term expires[] '. . . on or about December 26, 2019 and any purported option to extend the term beyond that date is invalid.'" (Bold omitted.)

The complaint alleged two causes of action. The first was for declaratory relief. It sought "a declaration that: a) the Initial Term of the Lease is valid for the full 99-year term; b) the Option

5

to renew the Lease for an additional ninety-nine (99) years is valid and enforceable and has been duly and properly exercised by way of the Notice delivered to Eureka; c) with the valid timely Notice of the exercise of the Option having been given, the Lease term shall not expire until on or about December 26, 2166; and d) Eureka's Rejection Notice [of the exercise of the Option] is invalid."

The second cause of action was to quiet title to the plaintiffs' leasehold interest in the Property through the alleged expiration date of December 26, 2166.

Eureka filed a cross-complaint against plaintiffs and HomeFed. It alleged that the Property "has been . . . unimproved rural land used for grazing cattle or other livestock, consistent with the 'agricultural' zoning designation of the Property." Therefore, the Property is subject to the 51-year maximum lease term of section 717. The cross-complaint consisted of two causes of action – one for declaratory relief and the other to quiet Eureka's title to the Property so that "[appellants'] leasehold interest in the Property under the Lease terminates on December 25, 2019."

*Statement of Decision and Judgments*

The trial court wrote a thorough, 51-page statement of decision. It noted: "Wild Cherry Canyon [the Property] was acquired by the Marré family in the early part of the 20th century as part of a parcel totaling approximately 9,000 acres and known as the Marré Ranch. . . . [¶] . . . [Wild Cherry Canyon] is undeveloped and has been used for cattle grazing for over 100 years. The Property has never been used to grow crops." "Grazing operations are important for wildfire prevention, which

continues to be a primary benefit of grazing cattle on the Property today."

The trial court continued: in 1966 the Marré family's "Cattle Company sold approximately 1,000 acres . . . of the Marré Ranch adjacent to Wild Cherry Canyon to another Marré family company, San Miguelito Park Company (Park Company).  Park Company . . . successfully rezoned that land . . . for recreational and residential uses.  Park Company then developed and operated the San Luis Bay Inn and an adjacent golf course."

"[T]he Marrés never sought to rezone . . . Wild Cherry Canyon."  "Improvements to the property include housing units occupied by ranch employees and ancillary structures related to cattle branding activities.  Since at least 1968, cattle grazing in Wild Cherry Canyon has been conducted by members of the Mello family pursuant to various subleases."

The trial court concluded that the term "agricultural purposes" in section 717 includes cattle grazing.  It found that the parties to the 1968 lease had "entered into the lease for agricultural purposes, namely for the purpose of carrying on the existing cattle grazing operations."

Novations of the 1968 lease occurred in 1977 and 1985. The trial court stated: "[B]ased on Plaintiffs' conduct and the surrounding circumstances following the novations, . . . Plaintiffs intended to continue the existing use of Wild Cherry Canyon for cattle grazing, while pursuing strategies to maximize its apparent value for sale to others.  Therefore, even after the novations, the 1968 Lease was one 'for agricultural purposes,' and is governed by section 717."

The trial court ruled: "Accordingly, section 717 governs and operates to limit the duration of the 1968 Lease to 51 years.  The

7

1968 Lease therefore expired on December 26, 2019.  As such, Plaintiffs and HomeFed have no right, title, estate, lien, or interest in Wild Cherry Canyon.  Eureka is entitled to a judgment declaring that it is the owner of all right, title, estate, and interest in Wild Cherry Canyon."

As to plaintiffs' complaint, the trial court entered judgment in favor of Eureka and against plaintiffs.  As to Eureka's cross-complaint, it entered judgment in favor of Eureka and against plaintiffs and HomeFed.

*The Term "Agricultural Purposes" in Section 717 Generally Includes Cattle Grazing*

The 51-year maximum period of section 717 applies only to leases "of land for agricultural or horticultural purposes." (*Ibid*.) The issue is whether land leased for cattle grazing constitutes land leased "for agricultural . . . purposes" within the meaning of section 717.[3]  To determine this issue, the trial court examined the meaning of the term "agricultural" "in the late 19th and early 20th centuries."  The court selected this time period because "the term 'agricultural' first was used by the Legislature in 1872 when enacting section 717 to apply to leases of 'agricultural lands,' and

---

[3] Land leased for cattle grazing cannot qualify as land leased for "horticultural purposes" within the meaning of section 717.  "[T]he labor of caring for grass lawns, trees, shrubbery, and flowers is horticultural in character." (*Kramer v. Industrial Acc. Commission of State of Cal.* (1916) 31 Cal.App. 673, 676.) Merriam-Webster's Online Dictionary (2025) defines "horticulture" as "the science and art of growing fruits, vegetables, flowers, or ornamental plants" <https://www.merriam-webster.com/dictionary/horticulture> [archived as of April 1, 2025] <Y3YV-BC74>.

again in 1895 when it amended its application to leases for 'agricultural purposes.'" The 1872 and 1895 statutes set a maximum lease term of 10 years.[4] In 1963 the maximum lease term was increased to 51 years. (Stats. 1963, ch. 1906, § 1, p. 3897.)

Appellants agree that the trial court properly focused on the Legislature's intent at the time of the statute's 1872 enactment and 1895 amendment.[5] "In construing statutes, we

---

[4] As amended in 1895, section 717 provided: "No lease . . . for agricultural purposes for a longer period than ten years, in which shall be reserved any rent or service of any kind, shall be valid." (Stats.1895, ch. 82, § 1, p. 75.) In 1909 section 717 was amended to apply to land leased "for agricultural or horticultural purposes." (Stats.1909, ch. 662, § 1, p. 1000.)

[5] Had the court instead focused on the current meaning of "agricultural purposes," it would have concluded that the term includes cattle grazing. In its statement of decision, the court said it "is persuaded that at least since the early 1960s, the term 'agricultural' included cattle grazing." (See *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 365 ["The property is utilized for agricultural purposes, including annual hay production and livestock grazing"]; *Simons v. Longbranch Farms, Inc.* (S.C. Ct. App. 2001) 345 S.C. 277, 281 ["The general definition of agriculture 'includes the rearing, feeding, and management of livestock' "].) Merriam-Webster's Online Dictionary (2025) defines "agriculture" as "the science, art, or practice of cultivating the soil, producing crops, and raising livestock" <https://www.merriam-webster.com/dictionary/agriculture> [archived as of April 1, 2025] <4TGU-SEHW.>

aim 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citations.] We look first to the words of the statute, 'because the statutory language is generally the most reliable indicator of legislative intent.' [Citations.] [¶] When the statutory text is ambiguous, or it otherwise fails to resolve the question of its intended meaning, courts look to the statute's legislative history and the historical circumstances behind its enactment." (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77.) The parties agree that there is no legislative history for section 717. The construction of a statute involves "a pure question of law" that we independently review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

In the trial court appellants contended "that in 1872 and 1895, the term 'agricultural' did not encompass cattle grazing." They relied in part on the testimony of two experts. They assert that the experts "testified in no uncertain terms when Civil Code section 717 was adopted in 1872 and amended in 1895, both the California Legislature and the public at large – including people living in San Luis Obispo County—did not consider cattle grazing to be an agricultural activity."

The expert testimony is not determinative. "Opinion evidence about the meaning of a statute, whether from a lay person or a purported expert, has long been held inadmissible." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1179; see also *Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 934 ["the meaning and purpose of a legislative enactment is a question of law for the court; an expert's opinion on such matters is an inadmissible legal conclusion"]; *Palmieri v. State Personnel Bd.* (2018) 28

Cal.App.5th 845, 860 ["the effect of California statutes presents purely legal questions outside the province of expert witnesses"].)

The trial court rejected appellants' contention that in 1872 and 1895 the term "agricultural purposes" did not encompass cattle grazing.  It reasoned: "Dictionaries of the time . . . defined the term 'agriculture' to include both the planting and growing of crops 'and also the raising and feeding of cattle or stock.'  (Noah Webster, An American Dictionary of the English Language, published by George and Charles Merriam (1860) p. 29.)  In particular, a legal dictionary of the period defines 'agriculture' by stating that '[a] person engaged [in] agriculture is engaged in raising cereals and stock' including 'cattle.'  (William C. Anderson, A Dictionary of Law, published by T. H. Flood and Company (1893) p. 45.)[6]  This understanding of the term was consistent with the Legislature's creation of the Department of Agriculture in 1919, which was vested, among other duties, with the 'duties, powers, responsibilities and jurisdiction' of the 'cattle inspection board.'  (*H. Moffatt Co. v. Hecke* (1924) 68 Cal.App. 35, 37, 38.)"

The trial court continued, "Eureka cites several cases in support of its position that the contemporary understanding of agricultural activities [at the time of section 717's enactment in 1872 and amendment in 1895] included the pasturing and rearing of cattle and other livestock.  [Citations to six cases omitted.]"  Moreover, in *Swithenbank v. Wood* (1929) 99 Cal.App. 341, 343, the court referred to "the Swithenbank ranch, together with the livestock . . . thereon," as "agricultural land."  (See also *People ex rel. Pletcher v. City of Joliet* (1926) 321 Ill. 385, 388-389,

---

[6] These dictionaries do not say that grazing for fire prevention is "agricultural."

11

152 N.E. 159 ["'Agriculture' is defined as the 'art or science of cultivating the ground, including harvesting of crops and rearing and management of livestock . . . .' Unless restricted by the context, the words 'agricultural purposes' have generally been given this comprehensive meaning by the courts of the country"].)

The trial court's broad interpretation of "agricultural" to include cattle grazing is consistent with treatises and case law: "'Definitions of agriculture in standard texts and treatises and in decisions in these latter years, have had the widest content. . . . An examination of the cases cited in Words and Phrases, Fifth Series, Vol. 1, p. 339 et seq., under "agriculture" and in 3 C.J.S., Agriculture, pages 361, 365 and 366, sec. 1, under "agricultural" and "agriculture," convinces that in modern usage this is a wide and comprehensive term and that statutes using it without qualification, [as here,] must be given an equally comprehensive meaning.'" (*Irvine Co. v. California Employment Commission* (1946) 27 Cal.2d 570, 575-576, quoting from *U.S. v. Turner Turpentine Co.* (5th Cir. 1940) 111 F.2d 400, 404-405.)

Appellants claim that one of the purposes of section 717 was to "protect farm lands from becoming unproductive from too many successive years of farming." They note, "[T]here is no issue . . . about farmland being exhausted or becoming unproductive" where, as here, the land was used for cattle grazing. Therefore, they logically argue, section 717 should not apply in these circumstances.

But preventing farmland from being exhausted is not the only purpose of section 717. In 1872 the Legislature also enacted section 718, which set a maximum time period for leases of non-agricultural land in cities. Sections 717 and 718 were "companion statute[s]" "enacted as part of the 1872 Civil Code."

(*Tufeld Corporation v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 26, 27, fn. 7 (*Tufeld*).) Section 718 originally provided, "'No lease . . . of any town or city lot, for a longer period than twenty years, in which shall be reserved any rent or service of any kind, shall be valid.'" (*Id*. at p. 22.) In imposing the 20-year time limit, the Legislature was obviously unconcerned with preserving the soil's fertility. Moreover, a 10-year limit on leases for agricultural purposes was unnecessary to prevent the exhaustion of farmland. Farmers have long practiced crop rotation to maintain the productive capacity of the soil.[7]

"The public policy underlying section 718's [and section 717's] application to commercial [and agricultural] leases is that excessively long leases . . . unduly hinder the use, development, and marketability of real property. [Such leases] are problematic because it is very difficult for the current generation to predict conditions future generations will face. [Citation.] 'Future generations deserve the opportunity to find the solutions to the problems of their day, and they most likely will have greater success than people long gone from the scene.'" (*Tufeld*, *supra*, 86 Cal.App.5th at p. 26; see also *id*. at p. 25 ["The broad language of the statute [section 718] advances the larger public policy purpose of not tying up land for an excessive period"].)

Thus, the trial court did not err in drawing the following conclusion: "[T]he legislators and courts of the late [19]th and

_____

[7] See Zverev et al., *Dynamic of the Soil Microbiota in Short-Term Crop Rotation*, (Feb. 1, 2023) Life (Basel), Abstract, <https://pmc.ncbi.nlm.nih.gov/articles/PMC9961364/ ["Crop rotation is one of the oldest and most effective methods of restoring soil fertility, which declines when the same plant is grown repeatedly"> [archived as of April 1, 2025] <R8SD-DSPP>.

early [20]th centuries used the term 'agricultural' broadly to include cattle grazing. Therefore, . . . the Legislature intended to include cattle grazing and ranching as well as crop farming" within the meaning of "agricultural" "when it enacted section 717" in 1872 and amended the statute in 1895. However, as we explain in the next part of this opinion, a lease for cattle grazing for the purpose of fire prevention may not qualify as a lease for agricultural purposes within the meaning of section 717.

*The Trial Court Erred in Concluding that*
*the Property Was Leased for Agricultural Purposes*

Section 717 applies only if the Property was leased for "agricultural purposes." The 1968 lease provided, "The premises may be used and improved by Lessee for any lawful purpose."

The 1968 Lease contemplated that the Property could be used for both agricultural and non-agricultural purposes. But there was no requirement that it be used at all. Raw, undeveloped land can remain just that. It does not "default" to "agricultural" even if it was historically used to graze cattle. The lease specified the annual rent, but stated that "[a]dditional rental hereunder shall be paid equal to fifty per cent (50%) of net profits from all non-agricultural activities conducted on the premises." In other words, if the Property was used solely for agricultural purposes, no additional rent would be due. But if the Property was used for both agricultural and non-agricultural purposes, as additional rent the lessee would be required to pay 50 per cent of the net profits from the non-agricultural use. The trial court reasoned: "This provision essentially acknowledges the Property's existing agricultural use for cattle grazing, while recognizing that additional nonagricultural uses were contemplated by the parties to the lease."

14

Appellants contend that, in determining whether the Property was leased for agricultural purposes, "the correct inquiry" is "what was the primary purpose of the parties in entering into the 1968 Lease." The trial court conducted this inquiry in its statement of decision. The court concluded, "[I]t is the purpose of the parties in entering into a lease that is the relevant inquiry under the statute," i.e., section 717.

The trial court concluded "that the primary purpose of the [1968] lease was for agricultural purposes, and that no other use of the land has been pursued in the intervening years." The specific purpose "was to perpetuate the Property's existing use for cattle grazing." "Thus, . . . the 1968 Lease was executed 'for agricultural purposes' and is subject to section 717.

"To the extent the trial court drew legal conclusions, we review the conclusions de novo. To the extent that the trial court made factual findings, we review them to determine if they are supported by substantial evidence." (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1169.) "[T]he credibility of [a witness] or the weight to be accorded his testimony were matters to be decided by the trial court and its determination is binding on this court." (*Kruger v. Department of Motor Vehicles* (1993) 13 Cal.App.4th 541, 547.)

Appellants' claim that the Property was not leased for agricultural purposes is based in part on the testimony of Richard Marré (Richard), a member of the family that entered into the 1968 lease. The original parties to the lease – Cattle Company (lessor) and Diablo (lessee) – "were wholly owned and controlled by members of the Marré family."

The trial court found "Richard's testimony to be credible." It noted: "Richard Marré[] served as an officer and director of

15

several corporations formed by the [Marré] family members during the 1960's to facilitate plans for development of the ranch, including Diablo Corporation.  Richard was *the sole witness* who was able to describe the various business dealings of the Marré family and the circumstances surrounding the execution of the 1968 Lease."  (Italics added.)  The court observed that "his testimony . . . was corroborated by many of the exhibits admitted at trial."

Appellants argue: "[Richard] stated the primary purpose of the . . . 1968 Lease was for estate planning, and a secondary purpose was for development of the property.  He also stated no agricultural use was contemplated.  According to Richard, . . . the cattle were there to eat grass for fire suppression; it was not a commercial activity.  By 1968 the cattle business was dead as there was no money in it."  (Record citations omitted.)

"The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting."  (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.)  Appellants assert: "The credible, corroborated and uncontroverted evidence from the only witness with first-hand knowledge [Richard] about the purpose of the 1968 Lease shows the primary purpose was not agricultural or cattle grazing."  "Since the inception of the 1968 Lease, the use of cattle for brush control and fire suppression has been incidental to the Marré family's and then Plaintiffs' main purpose – to maintain and keep surrounding properties safe and its property safe for future use or sale."

It is undisputed that cattle grazing was the actual use of the Property.  In their opening brief appellants concede: "[T]he [trial] court stated 'the Property had always been used for cattle

grazing, and it continued to be used for cattle grazing after the 1968 lease was executed.' [Record citation.] That is an accurate statement." "No one disputes cattle have historically grazed on Wild Cherry Canyon." "The cattle . . . have been on the property since at least the 1800s . . . ." In the trial court plaintiffs acknowledged that "[c]attle grazing . . . has been the *sole* use of the property for over a century . . . ." (Italics added.)

That the Property was leased for cattle grazing is supported by subleases to the Mello family. Appellants observe that Diablo, the original lessee under the 1968 Lease, "subleased the property to the Mello Family so the Mello family could graze their cattle." In the trial court plaintiffs admitted that they had "sublease[d] a portion of the Property for cattle grazing to Frank Mello."

The trial court found that the Property was not leased for development purposes. It considered "the absence of plans and activities consistent with pursuit of development of the Property." The court observed, "Although the Marré family pursued zoning changes and successfully developed other portions of the ranch, they did not pursue any zoning changes to allow for development of the Property."

As to appellants, the trial court stated: "[T]he evidence . . . shows that they made no concrete effort to actually push forward with a development plan. The Court concludes that Plaintiffs discussed and pursued development plans as a means to increase the value of the property for sale, and did not intend to expand its historical use for cattle grazing. There has been no change in the use of Wild Cherry Canyon since Plaintiffs acquired their leasehold interest. They have not put forward any applications for development with the County, and have not engaged in the

17

pre-development process with the Planning and Building Department."[8]

The trial court noted that, "[a]s of 1980, when the County adopted a countywide Land Use Plan, [the Property has been] designated in the agricultural land use category." Plaintiffs were "advised . . . that an application to change Wild Cherry Canyon's agricultural land use category was not likely to be granted. Other obstacles to development include the County's policy to discourage conversion of agricultural land to other uses, the need for Coastal Commission approval for any changes to the access road, and the need to obtain Eureka's consent as the landowner." "Eureka's representatives . . . confirmed that Eureka's interest in owning the fee title to Wild Cherry Canyon was to maintain its historical agricultural use."

But the Property should not be deemed to have been leased for "agricultural purposes" merely because it was not leased for development purposes and it was used solely for cattle grazing. Richard testified that the purpose of the cattle grazing was to reduce the risk of wildfires: "We did continue to have a grazing program just to keep the grass down." This was "[f]or fireproofing." "[W]e put cattle on [the Property] . . . to eat the grass, not because there was any money in it." The trial court found Richard to be a credible witness.

Several witnesses testified that the purpose of the cattle grazing in Wild Cherry Canyon was to reduce the risk of

---

[8] This 2,400-acre parcel is extremely valuable and there is no time limit on development plans in the future. Appellants may be waiting for the price of the land to go up before development and sale to a third party. They believed their leasehold lasted until 2166.

wildfires.  Denis Sullivan, who owned 10 percent of Pacho and San Luis Bay, testified that "[t]he main reason" the Property was subleased to the Mellos "was that if the cattle had not grazed on the property there was a very high risk of fire danger and . . . the cattle grazing kept that down."  Sullivan noted, "Frankie Mello . . . did a great job of basically running cattle all over the place to keep the fire danger down."  Joe Steinberg, the chairman of HomeFed, testified that "Pacho . . . allowed cattle to graze in Wild Cherry Canyon . . . [t]o suppress wildfires."  Thomas Jones, a director at Pacific Gas and Electric Company, Eureka's parent company, testified that for Eureka "fire suppression is the principal benefit" of allowing cattle to graze on the Property.  The trial court noted: "Eureka and PG&E also benefitted from the continued use of the Property for cattle grazing because it aided in fire prevention."

The trial court designated appellants' witness, Peter Livingston, "as an expert in agricultural viability as it relates to Wild Cherry Canyon."  Livingston testified: "[B]ecause Wild Cherry Canyon is largely dry grassland, it presents a significant wildfire risk if unmanaged.  The regular grazing of cattle is the most effective way to reduce the fire risks in Wild Cherry Canyon by eliminating potential fuel which would be grass.  Eliminating that fuel by any other way – like a mechanical way, like a rotary mower, would be cost prohibitive."[9]

---

[9] See Taylor, *Targeted Grazing to Manage Fire Risk* in **Targeted Grazing: A Natural Approach to Vegetation Management and Landscape Enhancement (ASI 2006) chpt. 12: "Carefully managed grazing is one important tool that can alter the amount and continuity of vegetation to reduce the potential for devastating wildfire . . . ."  "In light of the cost and potential drawbacks of traditional**

That the lease permitted cattle grazing for fire suppression is supported by the small scale of the operation and the nominal amount of rent paid by the sublessee. Based on his assessment "of soils, topography and availability of water," Livingston opined that Wild Cherry Canyon presently "would support a cow/calf operation of 54 cows, nine [steers] and three bulls and 45 calves," for a total of 111 head of cattle. Livingston further opined that, "as a standalone project," such a small cattle-grazing operation "is not a viable economic entity," i.e., it is not "sufficient to support a family without any outside income." "In a typical year it would be . . . netting about $12,000 . . . ."

"Based on aerial photography of Wild Cherry Canyon from 1969, [Livingston] performed the same analysis for the year 1968." He opined, "The number of cattle Wild Cherry Canyon can support for seasonal grazing has remained unchanged" since 1968.

On one of his visits to Wild Cherry Canyon, Livingston met Mr. Mello, "the manager of the cattle program there." Mello said the "head" of cattle "he was running" was "[v]ery similar" to the

---

**vegetation management options, grazing offers several benefits. Livestock disturb soil less than mechanical techniques, have a low risk of environmental contamination compared with herbicides, and avoid impairing air quality as with prescribed burning. What's more, targeted grazing is generally the least expensive." (The above-quoted excerpt is available on the internet at** https://chrome-extension:// efaidnbmnnnibpcajpcglclefindmkaj <https://bof.fire. ca.gov/media/8861/2-d-i-targeted-grazing-handbook_chpt12.pdf> [as of July 2, 2025], archived at <https://perma.cc/JR8R-9KRV7>.

number of cattle that the Property can support pursuant to Livingston's calculations.

The record contains an October 2013 month-to-month sublease of the Property to Frank Mello, Jr. and another person. The sublease does not state the monthly rent. In a letter to Eureka dated December 10, 2018, HomeFed said Mello was paying $2,400 per month. This was a nominal amount in view of the Property's size (2,400 acres) and the $39 million appraised value of plaintiffs' leasehold interest. The appraisal occurred in 2020. It was based on the assumption that the lease is valid through December 2166. The nominal amount of rent indicates that plaintiffs did not sublease the Property to Mello for the purpose of gaining revenue.

In its statement of decision the trial court recognized that "[g]razing operations are important for wildfire prevention, which continues to be a primary benefit of grazing cattle on the Property today." In view of all of the evidence, including the small scale of the cattle-grazing operation and the understanding by the parties to the lease that the grazing would be for the purpose of reducing the risk of wildfires, as a matter of law the 1968 lease was not for "agricultural purposes" within the meaning of section 717. Plaintiffs should not suffer a $39 million forfeiture of their leasehold interest because of their efforts to suppress wildfires on the Property.[10]

---

[10] In its petition for rehearing, respondent states, "[T]he Opinion's reasoning suggests, but does not specify, that a certain density of grazing is required for property to be put to an agricultural use for commercial purposes – *even where open, undeveloped rangeland is grazed at the maximum possible density*." Our opinion should not be so construed. Our conclusion is limited to the particular facts of this case. "Other

We recognize that the Mellos subleased the Property for the purpose of raising livestock. This probably explains "[t]he presence of baled hay" noted by Eureka in its brief. It is reasonable to infer that the Mellos placed the baled hay on the Property to provide extra feed for their cattle. Eureka claims, "The presence of hay as cattle feed on Wild Cherry Canyon gives rise to [the] inference[] that . . . the cattle were not there only to suppress the risk of wildfire, because feeding them hay is orthogonal, if not contrary, to that purpose." But we are not concerned with the Mellos' intent in placing baled hay on the Property. The controlling lease is the 1968 lease as novated in 1977 and 1985. In ascertaining the purpose of this lease, it is not determinative that, as Eureka observes in its petition for rehearing, "[t]he Mellos [sub]leased the property not to prevent fires, but to graze cattle."

"Following the . . . legal maxim that 'equity abhors a forfeiture,' the law 'traditionally disfavors forfeitures and statutes imposing them are to be strictly construed. [Citation.]' [Citation.] . . . 'The other canon of legal interpretation pertinent here is the rule prescribing the commonsense construction of statutes so as to avoid absurd results.'" (*People v. Far West Ins. Co.* (2001) 93 Cal.App.4th 791, 795.) It would be absurd to penalize appellants for taking measures to prevent wildfires and limit their spread.[11] In enacting and amending section 717, the

_____

factual scenarios are not before us." (*Kelsoe v. State Water Resources Control Bd.* (2007) 153 Cal.App.4th 569, 581, fn. 8.)

[11] "Cattle grazing can be used to create fuel breaks, which are strips or blocks where vegetation has been minimized or removed to slow the spread of wildfire, making it easier and safer for firefighters to combat wildfires." (USDA Northwest Climate

22

legislature surely did not intend to deter tenants in plaintiffs' situation from using cattle grazing to reduce the volume of flammable vegetation.  As appellants argue in their opening brief, "The fact the result would have been different if the Marrés and Plaintiffs had used [the costly and inefficient means of] lawn-mowers instead of cattle to keep the grass down [on 2,400 acres] for fire suppression demonstrates the absurdity of applying the statute in this case."

*Disposition*

The judgments are reversed.  Appellants shall recover their costs on appeal.

CERTIFIED FOR PUBLICATION.


YEGAN, J.


I concur:


GILBERT, P. J.

---

Hub, *Targeted Grazing for Wildfire Fuel Breaks*, <https://climatehubs.stg.platform.usda.gov/hubs/northwest/topic/targeted-grazing-wildfire-fuel-breaks> [as of July 2, 2025], archived at <https://perma.cc/Q6-U52F>.

23

CODY, J., Concurring:

I concur in the disposition but must part ways with the majority's reasoning.  Civil Code section 717's[1] target is restrictive leases, not tenants who use leased property for agricultural purposes.  I would reverse without reaching the issue of forfeiture.

"In construing statutes, we aim 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citations.]  We look first to the words of the statute, 'because the statutory language is generally the most reliable indicator of legislative intent.'  [Citations.]  [¶]  When the statutory text is ambiguous, or it otherwise fails to resolve the question of its intended meaning, courts look to the statute's legislative history and the historical circumstances behind its enactment." (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77.)  The construction of a statute involves "a pure question of law" that we independently review.  (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

Section 717 does not define or otherwise specify the meaning of "lease . . . for agricultural . . . purposes . . . ."  The statute, however, reflects a "'public policy notion that the free alienability of property fosters economic and commercial development.'" (*Tufeld Corp. v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 23.)  "Perpetuities are problematic because it is very difficult for the current generation to predict conditions future generations will face." (*Id.* at p. 26.)  "'Future generations deserve the opportunity to find the solutions to the problems of their day, and they most likely will have greater

[1] All statutory references are to the Civil Code.

1

success than people long gone from the scene.'" (*Ibid.*, quoting Korngold, *Resolving the Intergenerational Conflicts of Real Property Law: Preserving Free Markets and Personal Autonomy for Future Generations* (2007) 56 Am. U. L. Rev. 1525, 1556.)

The original version of section 717 stated: "No lease or grant *of agricultural land* for a longer period than ten years, in which shall be reserved any rent or service of any kind, shall be valid." (Former § 717, enacted by Stats. 1872, italics added.) The legislature amended the statute in 1895 to state: "No lease or grant of land *for agricultural purposes* for a longer period than ten years, in which shall be reserved any rent or service of any kind, shall be valid." (Former § 717, as amended (Stats. 1895, ch. 82, § 1), italics added.) The language remains in the current version.[2] This amendment directed the statute away from the actual or intended use of the land and toward the terms of the lease, or, more specifically, whether those terms prevent "future generations" from using the leasehold for non-agricultural purposes. Section 717 governs the purpose of a lease—not how the leased property is used.

Determining if a lease runs afoul of section 717 must begin with its express terms. (§§ 1638, 1639; see *County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415 [intent of contracting parties "'is to be inferred, if possible, solely from the written provisions of the contract'"].) Here is where the trial court went astray. It concluded the lease's terms showed its primary purpose "was to accommodate the existing agricultural

---

[2] The Legislature amended section 717 in 1909 to include leases "for . . . horticultural purposes" and to increase the lease term limit to 15 years. (Stats. 1909, ch. 662, § 1.) It increased the limit to 51 years in 1963. (Stats. 1963, ch. 1906, § 1.)

use while providing the lessee the opportunity to expand the use of Wild Cherry Canyon to other lawful nonagricultural purposes that would generate construction costs, net profits, and additional tax assessments." The provision requiring the lessee to share profits generated by nonagricultural uses, it found, "essentially acknowledges the Property's existing agricultural use for cattle grazing, while recognizing that additional nonagricultural uses were contemplated by the parties to the lease." These findings reveal two errors.

First, it is apparent the court considered extrinsic evidence when interpreting the lease's "express terms." The lease does not refer to cattle grazing or, for that matter, to any existing or intended use of Wild Cherry Canyon. The trial court did not just *interpret* the lease—it *reconciled* its terms with testimony and exhibits received at trial. Second, its preoccupation with the property's actual use diverted attention from the more important question, i.e., whether the lease prevents future generations from using Wild Cherry Canyon for non-agricultural purposes. I would conclude it does not.

The lease states appellants may use the property "for any lawful purpose." The trial court acknowledged appellants have "the opportunity to expand the use of Wild Cherry Canyon to other lawful nonagricultural purposes that would generate construction costs, net profits, and additional tax assessments." Respondents did not contend otherwise. The analysis should have ended there. Appellants or their successor-in-interest can decide how to use the leasehold between now and 2166. A court need not examine the historical record or scrutinize the Mellos' cattle operation to determine whether the unchanging terms of this lease create a perpetuity. It does not.

3

Section 717 is not a tool for property owners with lessor's remorse to wrest "any-purpose" leaseholds from long-term tenants who use the land for agricultural activities. The case for eviction should not grow stronger because the tenant chooses this use from among other allowed uses.

<u>CERTIFIED FOR PUBLICATION</u>.


CODY, J.

Rita C. Federman, Judge

Superior Court County of San Luis Obispo

_____

McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie; Loeb & Loeb and Daniel G. Murphy, Edward Capewell; Shoecraft & Associates and Robert D. Shoecraft, Devin T. Shoecraft; Hall Hieatt Connely & Bowen and Mark B. Connely, Catherine Hall Devlin, for Plaintiffs, Cross-Defendants and Appellants.

Miller Starr Regalia and Basil S. Shiber, Matthew C. Henderson, Angela J. Yu, for Defendant, Cross-Complainant and Respondent.